[Crim. No. 22464. Jan. 2, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
DALE MICHAEL BLOYD, Defendant and Appellant.

[Crim. No. 25554. Jan. 2, 1987.]

In re DALE MICHAEL BLOYD on Habeas Corpus.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

## COUNSEL

Tom Lundy, under appointment by the Supreme Court, for Defendant and Appellant and Petitioner.

John K. Van de Kamp, Attorney General, Daniel J. Kremer, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Edmund D. McMurray and Willard F. Jones, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**PANELLI, J.**—Defendant Dale Michael Bloyd was convicted on one count of first degree murder and one count of second degree murder. (Pen. Code, § 187.)[1] The jury found that he used a firearm in the commission of each murder (§ 12022.5). A special circumstance allegation, multiple murders (§ 190.2, subd. (a)(3)), was found to be true. The judgment of death was entered under the 1978 death penalty law (§ 190.1 et seq.). The appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).)

Defendant also seeks a writ of habeas corpus based on a claim that he received ineffective assistance by trial counsel. The Attorney General concedes error in counsel's failure to present mitigating evidence at the penalty phase of the trial (*People* v. *Deere* (1986) 41 Cal.3d 353 [222 Cal.Rptr. 13, 710 P.2d 925]). We therefore grant the petition and reverse the judgment of death. In all other respects the judgment is affirmed. If the People do not elect to retry the issue of penalty, defendant remains sentenced to life in prison without possibility of parole.

### I. GUILT PHASE

#### A. *Facts*

Martha Jones (hereafter Martha) and her father, William North (hereafter North), were shot to death in the early morning hours of April 27, 1981.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

Their bodies were found by Donald North, brother and son of the victims. respectively, in the hallway of the motor home owned by North in Yuba County. Defendant was arrested two days after in Susanville.

The prosecution's case, based almost entirely on circumstantial evidence, was premised on the theory that defendant first killed Martha and thereafter killed North. Defendant, who did not deny being at the scene, claimed that Martha first killed her father and thereafter accidentally killed herself when defendant attempted to defend himself against her assault on him.

### 1. *Prosecution Case.*

The North family had gathered at the mobilehome because the mother was in the hospital. Donald North, 60 years old, had come from Alaska. Defendant, 32, and Martha, with whom he lived, had travelled from Booneville with Eric, defendant's 9-month-old son by a prior marriage. Also present in the late afternoon and evening of April 26 were Martha's daughter, Rebecca, and Rebecca's boyfriend, Jim.

Sheriff's deputies described the crime scene: The body of North, clad only in a pair of slacks, was slumped forward with the legs bent under the body. His body was near a wall heater and partially obstructed the narrow, 31-inch wide hallway. His body was between Martha's body and the door of the master bedroom in which he slept. The body of Martha, clad in a blue bathrobe, lay outside the door of the other bedroom, which was next to the living room. Each victim had been shot in the head; the officers retrieved lead fragments and the copper jackets from two .357 magnum rounds. One of the copper jackets was found lying on Martha's prone body; the second was taken from a hole in the door of the master bedroom.

In the wall near Martha's head, about 21 inches from the floor, there was a horizontal gouge with a visible lead streak. The gouge mark ran parallel to the floor toward the rear of the trailer where, from the door of the master bedroom, the officers removed the copper-jacketed bullet. The bullet's lead core was intact. The gouge mark near Martha's head was spattered on both sides with blood. Also found down the hall, near the bullet (which was about 16 inches from the floor), were bone and hair materials later proved to be Martha's.

North's body was near the bathroom door, between the doors to the bedrooms. He was crumpled forward, his head down on the threshold of the bathroom. There were vertical gouge marks running downward on the wall heater next to North's head. The marks or striations, one of which tested positive for lead, ran downward from 17 to 14 inches from the floor. There

was blood below the striations and near North's head on the wall heater, and there was blood, later determined to be his, on his slacks just below the left knee. There was no blood on his back.

The ballistics expert testified it was "consistent" that the bullet that killed Martha was the same as that which left the lead-streak gouge on the wall near her head and which was found in the bedroom door.

The forensic pathologist testified that Martha (46 years old, 5 feet 8 inches tall, and 107 pounds) died from a pointblank gunshot wound to the head that entered the brain. The wound started at the left eye and went across her head from left to right. The bullet went through the nose and right eye and came out through the right side of the skull. Only two small lead fragments were left in her head. There was no physical evidence of a struggle, no bruises on wrists or on other parts of her body. Asked if the wounds and bullet tracking were consistent with self-infliction by a right-handed person, the pathologist responded: "It's really difficult to do this if one's actually got one's index finger in the trigger guard on a four inch barrel .357 magnum pistol . . . ."

The entry wound in North's head was in the back to the top and left. The track went down, back to front, and left to right, through the midportion of the brain, and exited just below the ear lobe on the right side. The size of the hole suggested a large caliber weapon such as a .357 magnum, fired within a foot of the head. The blood, when wet, had run from the wound to the front of the face and from the ear towards the forehead. The pathologist concluded from North's size and the position of his body, combined with the closeness of the shot, the angle of the bullet track, and the blood going forward from the wound toward the wall heater, that North could not have been standing when the wound was inflicted unless the killer held the gun above the victim's head and pulled the trigger with a thumb. The wound was such that North slumped or fell immediately and died within minutes. The doctor opined that the killer was standing and North's head was down low as if kneeling.

Martha's brother Donald testified that he returned from the hospital visit to his mother about 8:30 or 9 p.m. on the evening prior to the homicide. Martha and defendant were cooking dinner. He heard a "couple of arguments" between them in the course of the evening—they "cussed" at each other primarily "over the kid." Donald, who had been up all night the night before, retired between 11:30 and midnight; he conversed with his father in the bedroom prior to retiring, continued to hear "mumblings" from the living room, but heard nothing else until the phone rang about 7:30 a.m. the next morning. When awakened by the phone, he opened the door, saw

his father in a kneeling position in the hall, and yelled at him to answer the phone. He thought his father was talking to his sister, who was lying on her back. He then realized what had happened and sought help. Donald had heard no gunshots—he was hard of hearing. He saw no guns that evening or at any prior time; he thought Martha and defendant were "mad at each other," but that was "nothing new." Defendant made no threats against Martha, and there were no arguments between defendant and North, nor between Martha and her father.

Martha's daughter Rebecca testified to the close relationship between her mother and grandfather. Rebecca also testified to arguments between her mother and defendant concerning baby Eric. At midnight, Rebecca observed her mother lying on the bedroom floor; defendant walked between the bedroom and living room, mumbling, and on one occasion implored Rebecca to "talk to my mother, that she was upset with him." Rebecca declined. She left the trailer shortly thereafter and returned about 1:20 a.m. Donald and North were in bed. Martha was in the living room. In the presence of Rebecca and her boyfriend, defendant and Martha again engaged in a heated argument, again over who was going to take care of the baby: "They were arguing, "my mom was really upset. She was screaming and he was yelling at her." Rebecca and her boyfriend left at 1:30 a.m.

Rebecca testified that her mother owned a gun—a .357 magnum—which had been given her by her son before he went into the service. Rebecca did not see the gun on the evening before the homicide and had never seen her mother fire the weapon. She also stated that her mother took medication, Valium, given her by the doctor. According to Rebecca, Martha had taken one Valium that afternoon, the last she had.

Defendant was arrested in Susanville two days after the incident. After appropriate *Miranda* warnings, he gave successive statements to Sergeant Burke of the Susanville Police Department on April 29 and to Lieutenant Tindel of the Yuba County Sheriff's office on April 30. He told both the same basic story: After dinner Martha and her father argued. He (defendant) did not argue with Martha. He told one officer he retired at 10:30 or 11 and he told the other he retired at midnight. He woke up when he heard a gunshot. He stood up and saw North dropping in the hall near North's bedroom door. Martha was standing in the hallway near defendant's bedroom. Her hands were on the pistol pointed at him. He grabbed her hand and tried to wrestle the gun out of her hand while pushing the weapon up and away. Both were in a standing position when the gun went off, blowing her face away. He wound up with the .357 magnum in his hand. He dropped the weapon on the floor. (He told the other officer he had no recollection where the gun was.) He stepped over North's body to get his

belongings, picked up his son, and then drove toward Marysville in Martha's Pinto. He did not check on North or Martha before leaving. He told one officer that Martha's head and his were face to face when the gun went off. When the second officer questioned how Martha could shoot herself in such a situation, he told the officer that she spun around and her back was facing him when the gun went off.

### 2. *Defense Case.*

Defendant testified that, with the possible exception of Rebecca, everyone consumed alcohol during the evening in question, and Martha also had a bottle of Valium in her possession. She was in a "bad mood" and was cursing and arguing with her brother and father. She also "cussed" him, but he did not "cuss" back. Because of Martha's belligerent behavior, he retired before the others.

Defendant was awakened by the sound of a gun shot—he recalled hearing voices before he heard the shot, but he could not tell who was talking. He immediately got up and, through the bedroom door, saw a body slumping to the floor in the hallway. Martha confronted him in the doorway. She was holding the .357 magnum pistol in both hands and pointing it at him. He attempted to grab the gun and a struggle ensued. During the struggle the gun discharged and her face "exploded" in front of him. She immediately slumped to the floor. He did not intend for the gun to discharge. His recollection of the exact details of the shooting were "hazy." After the struggle, defendant dropped the gun, picked up his child, and drove off in the Pinto. He left because he needed time to think, because he was afraid his son would be taken from him, and because he was afraid of Donald North. He found himself near Susanville and decided to call his cousin who lived there and ask her to take care of the baby. At that time defendant told his cousin that "it was an accident"—meaning the shooting of Martha.

Defendant and other witnesses testified to violent threats or acts by Martha. In February 1981 she had an altercation with her landlord concerning her eviction and she threatened to "blow [his] fucking head off with a .357." Defendant testified that, after the threat, Martha got her gun, but he took it away from her. He gave it back the next day, after she "sobered up."

Another incident occurred at a bar in Booneville. Charles Stanton related a fight between Martha and Amy, defendant's ex-wife. The two began swearing at each other and Amy slapped Martha. Martha grabbed Amy's hair and hit her in the back of the head with a glass. Stanton and others broke up the fight as Martha threatened to "blow that son of a bitch away."

Stanton and defendant described another instance in which Martha worked herself into a "frenzy" against defendant and attempted to hit him. He subdued her, but as a result of that incident she asked the sheriff to arrest defendant. When the sheriff refused, she stated that the next time it happened, she would "blow his head off." Friends advised defendant to get rid of the gun, but it belonged to Martha and he could not talk her out of it. Defendant gave it to his mother to hide, but at Martha's request defendant retrieved the gun and packed it in their suitcase on the day they left for Yuba County. Defendant's mother corroborated his testimony in that regard.

A toxicologist testified for the defense that an analysis of Martha's blood taken during autopsy revealed a blood alcohol content of .23 percent. The blood analysis also revealed Valium in the amount of one part per million which is a level consistent with a constant user of the drug. The expert opined that, although the drug is designed to reduce anxiety and violent behavior, combined with alcohol it may produce a different reaction.

### 3. *Trial Proceedings.*

The prosecution sought a first degree murder verdict on the theory of premeditation and deliberation. It relied on the ballistics and crime scene evidence to support its theory that both Martha and North were victims of an "execution style" slaying. The prosecution argued that, since the copper jacket found on Martha's dead body came from the bullet which killed North, North must have been killed after Martha. As further indication that Martha was killed first, the prosecution argued that none of Martha's tissue or blood, nor lead fragments from the bullet that killed her, were found on North, whose body would have been in the path of the bullet.

As evidence of the premeditated nature of the North killing, the prosecution relied primarily on the nature of the wounds and the position of the body. The striations and blood on the wall heater, it was argued, indicated that he was shot while in a crouched position. Further, if North's head had not been bent over, the blood would have run down his back rather than forward from his ear. The prosecution also pointed to inconsistencies between defendant's testimony and what he told the arresting officers[2] and inconsistencies between the stories he told the two officers.

---

[2] Defendant first testified that he did not step over either body to get his belongings in the bedroom; on cross-examination he admitted he stepped over Martha's body. His statement to the officers that he had stepped over the body of North would have placed him at the end of the hall where, at trial, he denied having been.

Defendant also told both officers that he and Martha were standing when the gun went off. At trial, he admitted that, in the face of the physical evidence, he could no longer be sure.

The court instructed on the degrees of murder and on voluntary and involuntary manslaughter, excusable homicide based on heat of passion or sudden provocation, and on justifiable homicide based on self defense, including the honest but unreasonable belief in the necessity to defend.

The jury returned a verdict of first degree murder as to North and a verdict of second degree murder as to Martha.

### B. Guilt Phase Issues

#### 1. Representative Jury.

■ Defendant contends that the exclusion of several prospective jurors because of their opposition to the death penalty denied him a representative jury. A majority of this court rejected the contention in *People v. Fields* (1983) 35 Cal.3d 329, 342-353 [197 Cal.Rptr. 803, 673 P.2d 680] (plur. opn.), 374 (Kaus, J., conc.). (Accord *Lockhart v. McCree* (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758].)

#### 2. Sufficiency of the Evidence.

As to the first degree murder of North, defendant contends that there is no substantial evidence that he killed North and, further, that there is insufficient evidence of premeditation and deliberation. The essence of defendant's contentions as to the second degree murder of Martha is that (1) the homicide was justifiable as a matter of law and (2) the evidence of provocation disproves the existence of malice.

■ We must determine, after review of the whole record, whether the evidence is such that a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 576-577 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319 [61 L.Ed.2d 560, 573, 99 S.Ct. 2781].) The standard of review is the same in cases where the People, as here, rely primarily on circumstantial evidence. (*People v. Hillery* (1965) 62 Cal.2d 692, 702 [44 Cal.Rptr. 30, 401 P.2d 382]; *People v. Teale* (1969) 70 Cal.2d 497, 505 [75 Cal.Rptr. 172, 450 P.2d 564]; *People v. Newland* (1940) 15 Cal.2d 678, 681 [104 P.2d 778].) Further, we must view the evidence in the light most favorable to the People and presume in support

---

When arrested, defendant told the officers that, when he left the house, he did not know who the dead man was, but learned from the newspapers that it was North. At trial defendant testified that he checked the dead man before leaving the house. Defendant had known North for 20 years.

of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*People* v. *Caudillo* (1978) 21 Cal.3d 562, 570-57 [146 Cal.Rptr. 859, 580 P.2d 274]; *People* v. *Vann* (1974) 12 Cal.3d 220, 225 [115 Cal.Rptr. 352, 524 P.2d 824]; *People* v. *Redmond* (1969) 71 Cal.2d 745, 755-756 [79 Cal.Rptr. 529, 457 P.2d 321]; *People* v. *Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649]; *People* v. *Johnson, supra,* 26 Cal.3d 557, 576.)

### a) *Evidence That Defendant Killed North.*

■ Albeit circumstantial, there was ample evidence to support the People's theory that the defendant killed North. ■ "Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt." (*People* v. *Pierce* (1979) 24 Cal.3d 199, 210 [155 Cal.Rptr. 697, 595 P.2d 91].) ■ The defendant's presence at the scene was not disputed. The inferences to be drawn from the ballistics and crime scene evidence were for the jury. The jury could conclude that the copper jacket from the bullet that killed North was the copper jacket found lying on Martha's body. Only two shots were fired, and the second bullet, embedded in the door, was not only surrounded by her hair and tissue, but also was located to match the trajectory of the horizontal gouge marks next to her head. Therefore, rejecting defendant's version of the events, the jury could conclude that Martha had been shot first.

Further, defendant's flight and contradictory statements to the police demonstrate a consciousness of guilt. Defendant disputes the probative value of "consciousness of guilt" evidence. *People* v. *Toledo* (1948) 85 Cal.App.2d 577 [193 P.2d 953] and *People* v. *Mercer* (1962) 210 Cal.App.2d 153, 162 [26 Cal.Rptr. 502], upon which he relies, are not apposite. Those cases stand for the proposition that where identity is not at issue and the defendant is relying on a theory of self-defense, the probative value of flight is minimal. Here, however, the identity of North's killer *is* in issue and, as to North, defendant *is not* relying on the theory of self-defense.

### b) *Evidence of Premeditation and Deliberation.*

Defendant contends that, in any event, there was insufficient evidence of premeditation and deliberation to support a verdict of first degree.

*People* v. *Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942], sets the guidelines for reviewing findings of first degree murder based on premeditation and deliberation. (See also, *People* v. *Haskett* (1982) 30 Cal.3d 841, 849-850 [180 Cal.Rptr. 640, 640 P.2d 776].) We refer to three types of evidence: (1) facts about a defendant's behavior before the killing

that show prior *planning* of it; (2) facts about any prior relationship between the defendant and that victim from which the jury could infer a *motive;* and (3) facts about the *manner* of the killing from which the jury could infer that the defendant intentionally killed the victim according to a preconceived plan. (*Anderson, supra,* pp. 26-27; *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 749 [175 Cal.Rptr. 738, 631 P.2d 446].) ■ The court will uphold verdicts whenever there is (1) "extremely strong evidence" of planning; or (2) evidence of motive in conjunction with either (a) evidence of planning or (b) evidence of a manner of killing showing that the killer must have had a preconceived design. (*Anderson, supra,* p. 27; *People* v. *Arcega* (1982) 32 Cal.3d 504, 518-519 [186 Cal.Rptr. 94, 651 P.2d 338].)

■ The People concede that the evidence of planning was ambiguous. They rely on defendant's admission that he obtained the .357 magnum from his mother prior to the trip to Yuba County and that he carried shells on his person. The manner of killing, however, was very strong evidence of deliberation and premeditation: The evidence described actions that were cold and calculated—execution-style killings, shots to the head while Martha was lying on her back and North was kneeling. Martha had been shot pointblank, while North was shot by a standing killer from a distance of one foot. Further, there was no evidence, such as bruises or lacerations, to demonstrate a struggle. As evidence of motivation, the People point to the anger expressed by defendant prior to the killing and, as to the killing of North, the need to effect an escape.

There is no evidence as to the period of time between Martha's killing and that of North. ■ However, premeditation and deliberation can occur in a very short period of time. (*People* v. *Velasquez* (1980) 26 Cal.3d 425, 435 [162 Cal.Rptr. 306, 606 P.2d 341].) The test is not time, but reflection. "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . .'" (*Ibid.*) In our view, the record in this case supports a verdict of first degree murder in the killing of North under the *Anderson* formulation of evidence of motive in conjunction with the evidence of the manner of killing.

c) *Evidence of Malice.*

■ Defendant argues that there is no evidence of malice to sustain the verdict of second degree murder. The Attorney General contends, on the other hand, that not only is there ample evidence to sustain the second degree verdict on the basis of either implied or express malice, there is sufficient evidence to support a first degree murder verdict in the killing of Martha. It is urged that, even if that part of defendant's story which is not refuted by physical evidence is believed and we accept that Martha came at

defendant with a gun, there is still adequate evidence to support a first degree murder in the fact that she was shot at point-blank range while down, that she weighed 107 pounds and he 250, that she had a blood alcohol level of over .23, and that it was virtually physically impossible for her to have self-inflicted the wound. In any event, it is urged, the circumstantial evidence supports a second degree murder based on express malice—that defendant had intent to kill.

Defendant contends that it is the prosecution's burden to "disprove" defendant's "reasonable explanation of the killing." He relies on *People* v. *Collins* (1961) 189 Cal.App.2d 575 [11 Cal.Rptr. 504], which held that when the prosecution presents, as a part of its case, a statement of defendant as to how a killing occurred, it is bound by that evidence absent proof to the contrary.

The same argument was made and rejected in *People* v. *Lines* (1975) 13 Cal.3d 500, 505 [119 Cal.Rptr. 225, 531 P.2d 793], where it was urged that the prosecution failed to establish malice because defendant's statement, introduced in evidence by the prosecution, precluded any finding of implied malice. We said, "While it is true that defendant's statement in large part might preclude a finding of malice, there is in the record ample evidence to the contrary supportive of a finding of implied malice. ■ It is settled that the necessary element of malice may be inferred from the circumstances of the homicide . . . Thus this court has declared that '[w]hen the killing is proved to have been committed by the defendant, and nothing further is shown, the presumption of law is that it was malicious and an act of murder; but in such a case the verdict should be murder of the second degree, and not murder of the first degree.' "

■ As in *Lines,* and unlike *Collins,* while defendant's statements were introduced during the prosecution's case-in-chief, other evidence, independent of his statements—the physical evidence, especially the ballistics evidence—was inconsistent with defendant's version and supports a finding of malice.

■ Defendant's second contention regarding Martha is that the prosecution failed to prove absence of provocation. ■ The prosecution must "prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case." (*Mullaney* v. *Wilbur* (1975) 421 U.S. 684, 704 [44 L.Ed.2d 508, 522, 95 S.Ct. 1881].) ■ Malice is implied "when no considerable provocation appears." (§ 188.)

Defendant's argument is premised on an assertion that the record contains considerable evidence of provocation, sudden quarrel, and heat of

passion. While the record contains evidence of quarrels between defendant and Martha up to at least 1:20 a.m., the totality of those verbal assaults does not constitute evidence of provocation sufficient to reduce the homicide to manslaughter. Defendant testified that he went to sleep after the quarrels and, in his version, he awoke to a physical encounter involving defense of self. His defense at trial was accident or self-defense.

Defendant argues that Martha's assault on him was provocation sufficient to reduce the homicide to manslaughter. His reliance on *People* v. *Castro* (1940) 37 Cal.App.2d 311 [99 P.2d 374], is misplaced. In *Castro,* a first degree murder was reduced to voluntary manslaughter, based on sudden quarrel or heat of passion. The husband slashed the wife with a knife after she had grabbed a knife and tried to stab him, stabbed herself accidentally, and then dropped the knife. All this occurred *during an argument* that had been going on for some time.

In contrast, defendant at no time claimed to have killed Martha on sudden quarrel or heat of passion—on provocative conduct. As noted, his defense was accident or self-defense.

Even if defendant's testimony provided some evidence of provocation for the jury to consider, it remains the jury's exclusive province to decide whether the particular facts and circumstances are sufficient to create a reasonable doubt as to whether the defendant acted under a heat of passion. (*People* v. *Pacheco* (1981) 116 Cal.App.3d 617 [172 Cal.Rptr. 269]; *People* v. *Ozene* (1972) 27 Cal.App.3d 905 [104 Cal.Rptr. 170].) Here, the jury was properly instructed on voluntary manslaughter and heat of passion or sudden quarrel. They found malice, and we conclude the evidence is sufficient to support the finding.

### d) *Section 1118.1 Motion.*

██ After the prosecution rested its case, defense counsel moved pursuant to section 1118.1 for acquittal based on insufficient evidence. The trial court determined that the evidence was sufficient to permit submission to the trier of fact. The test to be applied by the trial court under the section is the same test applied by an appellate court in reviewing a conviction. (*People* v. *Lines, supra,* 13 Cal.3d 500, 504-505.) Inasmuch as we have determined above that the evidence is sufficient to sustain the judgment, we do not repeat the same evidence which, minus the evidence presented by the defense, is even stronger. The trial court did not err. The section 1118.1 motion was properly denied.

### 3. *Instructional Error.*

Defendant makes numerous assignments of instructional error. Where we find error, we conclude it is de minimis and not prejudicial. We also note at the outset that a copy of the instructions was sent to the jury room.

#### a) *Use of Circumstantial Evidence.*

The court explained direct and circumstantial evidence (CALJIC No. 2.00) and it gave the general sufficiency of circumstantial evidence instruction (CALJIC No. 2.01)[3] which is required to be given by the court on its own motion where the case rests substantially or entirely on circumstantial evidence, as it does here. (*People* v. *Yrigoyen* (1955) 45 Cal.2d 46, 49 [286 P.2d 1]; *People* v. *Bender* (1945) 27 Cal.2d 164, 174 [163 P.2d 8].) In an abundance of caution, in the prosecutor's view, or as required, in the defendant's view, the court also instructed as to circumstantial evidence to prove specific intent. Its instruction was based on CALJIC No. 2.02,[4] but in its reading, the trial court deleted the phrase "(or) (mental state)."

---

[3] CALJIC No. 2.01 reads as follows: "However, a finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only (1) consistent with the theory that the defendant is guilty of the crime, but (2) cannot be reconciled with any other rational conclusion.

"Further, each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which such inference necessarily rests must be proved beyond a reasonable doubt.

"Also, if the circumstantial evidence [as to any particular count] is susceptible of two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, it is your duty to adopt that interpretation which points to the defendant's innocence, and reject that interpretation which points to his guilt.

"If, on the other hand, one interpretation of such evidence appears to you to be reasonable and the other interpretation to be unreasonable, it would be your duty to accept the reasonable interpretation and to reject the unreasonable."

[4] CALJIC No. 2.02 reads as follows: "The (specific intent) ~~(or) (mental state)~~ with which an act is done may be shown by the circumstances surrounding the commission of the act. But you may not find the defendant guilty of the offense in Counts 1 and 2 or the lesser included offense of second degree murder and voluntary manslaughter, unless the proved circumstances not only are consistent with the theory that he had the required (specific intent) ~~(or) (mental state)~~ but cannot be reconciled with any other rational conclusion. The necessary specific intents will be given to you in subsequent instructions by the Court.

"Also, if the evidence as to (any) such (specific intent) ~~(or) (mental state)~~ is susceptible of two reasonable interpretations, one of which points to the existence of the (specific intent) ~~(or) (mental state)~~ and the other to the absence of the (specific intent), ~~(or) (mental state)~~ it is your duty to adopt that interpretation which points to the absence of the (specific intent) (or) (mental state). If, on the other hand, one interpretation of the evidence as to such (specific intent) ~~(or) (mental state)~~ appears to you to be reasonable and the other interpretation to be unreasonable, it would be your duty to accept the reasonable interpretation and to reject the unreasonable."

 Defendant points out that malice is a separate and distinct mental state which can be established independent of the specific intent to kill, and he argues that eliminating the words "or mental state" precluded the jury from applying the principles of CALJIC No. 2.02 to the existence of the mental states of malice and premeditation and deliberation. We do not agree.

First, the court was not obligated to give CALJIC No. 2.02. The use note states that the instruction is designed for use *instead of* CALJIC 2.01 in a specific intent or mental state case in which the *only element of the offense* which rests substantially or entirely on circumstantial evidence is the element of specific intent or the mental state. In this case, the specific question that would have been posed by adding "or mental state" was presented by the general circumstantial evidence instruction that was given.

More importantly, defendant suffered no prejudice from the trial court's omission of the words "or mental state." The jury was twice cautioned on the inferences to be drawn from circumstantial evidence susceptible of two interpretations; it was instructed on the mental states required as elements of the charges and included offenses; it was instructed to consider all instructions as a whole and to regard each in light of others. Under the circumstances, it is not reasonably probable that the omission of the phrase in question confused or misled the jury. (*People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243].)

b) *Malice.*

The *written* form of CALJIC No. 8.11 defining malice, which was sent to the jury room, included the definition of implied malice "[or] [when the killing is a direct causal result of the perpetration or the attempt to perpetrate a felony inherently dangerous to human life]." The bracketed portion has reference to felony murder. Felony murder, of course, was no part of the prosecution's case, and the trial court had not included it in the oral rendition of the instruction.

 While the trial court undoubtedly erred in failing to strike the reference from the written instruction, reversal is not required. We find wholly without merits[5] defendant's claim that the court's failure to line out one phrase of CALJIC No. 8.11 misled the jury to find implied malice based on felony murder and thereby deprived him of his self defense and justifiable homicide defenses. First of all, felony murder was not a trial theory relied upon by the prosecution and no instructions concerning or defining

---

[5] The claimed error applies only to the killing of Martha: the jury found premeditation and deliberation—express malice—in the killing of North.

this theory were given. Secondly, the instructions given by the court encompassed all potentially applicable homicide theories and all possible defenses in relation thereto.

Defendant's reliance on *People* v. *Murtishaw, supra,* 29 Cal.3d 733 is misplaced. An unnecessary instruction on implied malice, based on felony murder, was given in *Murtishaw.* Although we recognized that implied malice as defined in CALJIC No. 8.11 cannot coexist with a specific intent to kill and that it may confuse the jury to instruct on implied malice when the charge (there, assault with intent to commit murder) requires a specific intent, we nevertheless did not find prejudice in the erroneous instructions. In *Murtishaw,* the court had given contradictory instructions and the error was cured by application of a *Sedeno* analysis.

Here, the court's oral instruction was entirely correct and the only potentially misleading phrase was contained in a written form of the instruction which defendant now speculates may have confused the jury. We apply the *Watson* test of prejudice and conclude the error was harmless. (*People* v. *Watson, supra,* 46 Cal.2d 818.)

### c) *Excusable Homicide.*

The court gave CALJIC No. 5.01—Excusable Homicide—Heat of Passion.[6] Defendant now urges that the court should have given CALJIC No. 5.00.[7] The claim is that, inasmuch as 5.01 precludes accident as a defense if a firearm is used, the jury may have concluded that the defense of accident was not available to defendant. The reasoning is circuitous for, as we have noted, defendant consistently claimed that he used no weapon against Martha.

Insofar as an accident theory is supported by the evidence, it is highly questionable that any instruction on this theory was required. When de-

---

[6] CALJIC No. 5.01 provides: "Excusable Homicide—Heat of Passion

"The unintentional killing of a human being by accident and misfortune is excusable when committed in the heat of passion upon a sudden combat or upon a sudden and sufficient provocation which would provoke a reasonable man to fight, provided:

"1. The person killing was not the original aggressor;

"2. No undue or unfair advantage was taken of the other by the person killing;

"3. No dangerous or deadly weapon was used by the person who killed during the fight;

"4. The killing was not done in a cruel or unusual manner; and

"5. The act of killing was not the result of gross negligence."

[7] CALJIC No. 5.00 provides: "Excusable Homicide—Lawful Act

"The unintentional killing of a human being is excusable and not unlawful when committed by accident and misfortune in the performance of a lawful act by lawful means and where the person causing the death acted with that care and caution which would be exercised by an ordinarily careful and prudent individual under like circumstances."

fendant left the scene and before he was arrested, he told his cousin, "it was an accident." When amplified by later statements of defendant and by his testimony at trial, it became clear that at no time did he claim to have killed Martha by accident. His claim was, instead, that *she* killed herself by accident as he struggled with her in defense of himself.

Complete instructions were given on self defense, on first and second degree murder and manslaughter as well as the presumption of innocence, reasonable doubt, burden of proof and the principle for testing the sufficiency of circumstantial evidence. Defendant neither requested an instruction on excusable homicide nor did he object to the instruction given. It would not have been error to refuse an instruction on justifiable homicide based on accident (*People* v. *Ogg* (1958) 159 Cal.App.2d 38, 52-53 [323 P.2d 117]), and it is not reasonably probable that a different result would have been reached had the instruction not been given at all.

#### d) *Self-defense.*

Extensive self-defense instructions were given. Defendant claims that the court erred in failing to give CALJIC No. 5.54 which states: "The right of self-defense is not immediately available to a person who was originally an assailant, but such person must really and in good faith endeavor to decline further combat and fairly and clearly inform his adversary of his desire for peace and that he has abandoned the contest. After such steps have been taken, if his opponent continues the fight, the rights of the person who was the original assailant, with respect to self-defense, are then the same as the rights of any person assailed by another."

Under defendant's version of the events of the evening in question, he retired at 11:30 or 12 and was awakened by the gunshot which he claims killed North; Martha was at his doorstep pointing a gun at him. Under no version of his story is he the "person who was originally an assailant." Defendant did not request the instruction and the court had no obligation under the evidence to give the instruction sua sponte.

#### e) *Manslaughter.*

The trial court instructed on voluntary manslaughter, correctly noting that "there is no malice aforethought if the killing occurred upon a sudden quarrel or heat of passion, *or* in the honest but unreasonable belief in the necessity to defend oneself against imminent peril to life or great bodily in-

jury.[8] (Italics added.) The court also read CALJIC No. 8.50 which relates the distinction between murder and manslaughter. Reading from the printed version, the court said: "When the act causing the death, though unlawful, is done [in the heat of passion or is excited by a sudden quarrel such as amounts to adequate provocation] [in the honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury] . . . ." (CALJIC No. 8.50.) The court, in its reading, ran the two bracketed phrases together—it failed to insert an "or."

While the court erred in the reading of CALJIC No. 8.50, we do not believe, as defendant contends, that the jury was prejudicially confused so as to deny him the "heat of passion and sudden quarrel" defense. As noted, the jury was correctly told that malice could be negated in two ways under CALJIC No. 8.40. Other instructions explained sudden quarrel or heat of passion and provocation (CALJIC No. 8.42). It seems inconceivable that the jury did not realize that the heat of passion concept was a separate alternative to the honest but unreasonable belief in necessity to defend concept.

### f) *Descriptive Titles on Written Instructions.*

Defendant submits no authority for his proposition that the court erred in failing to delete the descriptive title and the source of the written instructions that were sent to the jury room. Moreover, trial counsel did not request that the titles be deleted, nor did he object to the written instructions going to the jury.

In *People* v. *Welborn* (1966) 242 Cal.App.2d 668 [51 Cal.Rptr. 644], it was argued that the court erred in permitting the instructions to be taken into the jury room. The appellate court held: "Penal Code section 1137 states that instructions may be taken into the jury room. Contending that it was error for the judge to permit this in the case at bench because some of the instructions contained deletions and additions by the judge, and because

---

[8] CALJIC No. 8.40 reads as follows: "VOLUNTARY MANSLAUGHTER—DEFINED

"[D]efendant is charged in [Count _____ of] the information with the commission of the crime of voluntary manslaughter, a violation of Section 192 of Penal Code.]

"The crime of voluntary manslaughter is the unlawful killing of a human being without malice aforethought when there is an intent to kill.

"There is no malice aforethought if the killing occurred upon a sudden quarrel or heat of passion, [or] in the honest but unreasonable belief in the necessity to defend oneself against imminent peril to life or great bodily injury].

"In order to prove the commission of the crime of voluntary manslaughter, each of the following elements must be proved:

"1. That a human being was killed,

"2. That the killing was unlawful, and

"3. That the killing was done with the intent to kill."

certain of the instructions indicated which side had offered them (or the fact that some were 'Court' instructions), defendant cites *People* v. *Lyons* [(1956)] 47 Cal.2d 311, 322-323. The case has no application. The instruction there condemned was a formula instruction added by the judge indicating his belief in the guilt of the accused. There was nothing of that nature here. . . ." (242 Cal.App.2d at p. 677.)

As the Attorney General notes, descriptive titles undoubtedly aided the jurors to find the particular subjects they wished to consult. We find no error.

### g) *Cumulative Prejudice.*

■ Defendant argues that although the foregoing instructional errors may not independently require reversal, their cumulative effect constituted prejudicial error requiring reversal. We do not agree.

■ In addition to the alleged errors that are individually submitted as erroneous in the preceding paragraphs, defendant assigns error in failing to define specific intent, in giving standard "consciousness of guilt" instructions, and in failing to tell the jury that it must consider each count separately, uninfluenced by its decision as to any other. The asserted deficiencies are de minimis.

■ And, finally, defendant points to alleged deficiencies in the form and delivery of the written instructions. Even if we agreed, reversal of the judgment would not be required. Thus, we can agree that it would be preferable if the jury was not presented with copies of the "working" instructions, but rather had before it a verbatim rendition of the judge's actual comments. It must be remembered, however, that the jury can ask for a rereading of any instruction which gives it pause. Here there is no indication that the jury was confused by the fact that some instructions were printed and some were typed and that some contained CALJIC copyright language and some did not.[9]

---

[9] The jury was told as to the written instructions which were being sent to the jury room: "Don't deface them in any way. Now, let me tell you something. Some of these instructions might be printed, some might be typewritten, some might have my handwriting on them. I may have modified some or stricken out some things, or I may have filled in blanks or lined something out. Don't be concerned with that or the reasons I've done that. I've just tried to modify them so they fit our situation. Disregard any deleted part and don't speculate on what might have been so to speak, okay, or the reason I deleted something. Every part of the instructions that you will have in there, whether printed, typed, handwritten, so forth, is of equal importance. And you are to be governed only by the instruction in its final working, whether printed, typed, handwritten. Remember that." (See discussion of CALJIC No. 17.45, on which court's instruction was based, in *People* v. *Dagnino* (1978) 80 Cal.App.3d 981, 995-996 [146 Cal.Rptr. 129].)

## 4. *Qualifications of Ballistics Expert.*

Ballistics expert William Robertson testified to the possible trajectory of the bullet that killed Martha, in support of the prosecution's theory that the bullet found in the bedroom door was the bullet that killed Martha and the copper jacket found resting on Martha's stomach came from the bullet that killed North. Defendant complains that Robertson was not qualified to testify as to the trajectory of the bullet because he was not sufficiently qualified in the field of exterior ballistics.

■ A person is qualified to testify as an expert if he has special knowledge, skill, experience, training or education sufficient to qualify him as an expert on the subject to which his testimony relates. Whether a person qualifies as an expert in a particular case, however, depends upon the facts of the case and the witness's qualifications. (*People* v. *Kelly* (1976) 17 Cal.3d 24, 39 [130 Cal.Rptr. 144, 549 P.2d 1240].) The trial court is given considerable latitude in determining the qualifications of an expert and its ruling will not be disturbed on appeal unless a manifest abuse of discretion in shown. (*Id.; Putensen* v. *Clay Adams, Inc.* (1970) 12 Cal.App.3d 1062, 1081 [91 Cal.Rptr. 319].)

■ Robertson stated his education and experience.[10] On voir dire he explained the difference between internal and external ballistics, the latter being the motion of a bullet or projectile after it leaves the weapon, including fragmenting and ricocheting. He indicated that although external ballistics was not his area of specialty, he had been qualified in other cases and had testified to the movement of bullets through the air.

When Robertson was asked whether a bullet could gouge the wall near Martha's head and travel down the hall to embed in the door, the defense objected on the lack of foundational basis as an expert in exterior ballistics. The court then examined Robertson.[11]

---

[10]Robertson was a criminalist with the Department of Justice and Royal Canadian Police for 25 years. He specialized in firearms identification. He had a bachelor of science degree in chemistry and had done postgraduate work at MIT. He regularly read periodicals, including the A.F.T.I. Journal for firearms examiners. He also read two monthly journals on ammunition and new weapons. He had qualified in the Superior Court of Yuba County.

[11]"THE COURT: Mr. witness, let me ask you some questions.

"You understand the nature of the question posed to you by the District Attorney when he said that if you assume certain facts and marks.

"Have you had any training in either school or by way of reading or experience which goes to give you any expertise in answering the question on the trajectory that we were just talking about?

"THE WITNESS: Yes, Your Honor.

"THE COURT: Okay. Can you tell us what that is?

Robertson was candid about the limited area of external ballistics in which he considered himself an expert—not an expert on the question of "muzzle velocity, the speed of the bullets, the force at which certain powder grains impact," but an expert on "the motion of the bullet through the air." Robertson thereafter was asked and answered the question as to the trajectory of the bullet that caused the lead streak on the wall near Martha's head. Defense counsel made no further objection.

Contrary to defendant's assertions, this case is not governed by *People* v. *Hogan* (1982) 31 Cal.3d 815, 852 [183 Cal.Rptr. 817, 647 P.2d 93], where we held that mere observation without analysis or inquiry cannot qualify a witness as an expert. Clearly, Robertson's expertise was not merely based on observation. The court did not abuse its discretion in qualifying him.

### 5. *Denial of Constitutional Rights Pending Jury Deliberation*

Defendant contends that he was denied his constitutional right to be present at trial (Cal. Const., art. I, § 15) and denied the right to counsel (*id.;* U.S. Const., 6th Amend.) as a result of two incidents that occurred after the jury retired for deliberations. Ten minutes after the jury retired, it sent a note stating that a bottle of Valium had been found in Martha's blue robe and asking whether the jury could consider it as evidence. Defense counsel stated that it should be considered as evidence; the prosecution agreed to let it be considered as evidence.[12]

---

"THE WITNESS: That is the firing and recovering of many test bullets over the years of different calibers and the motion of those bullets through the check devices.
"THE COURT: Have you done that?
"THE WITNESS: Yes.
"THE COURT: Okay.
"THE WITNESS: When I—when I was asked the question of external ballistics, Your Honor, there is a lot more to it than I would try to qualify myself.
"I'm talking about the muzzle velocity, the speed of the bullets, the force at which certain powder grains impact on certain objects.
"I'm not qualified to testify, that's what I meant by not being fully qualified in external ballistics but the motion of the bullet through the air, I've had a great deal of experience with."

[12] The total of the proceedings, apparently conducted in chambers, follows:
"THE COURT: Let the record show that we are in chambers on People v. Bloyd. The jury has sent in a note to the court. They have examined the robe of the deceased and found a bottle of Valium in the robe, and they want to know if it should be considered as evidence.
"A discussion was held with both counsel in chambers, the defense counsel [Mr. Buckley] indicate to the Court that, yes, it should be considered as evidence.
"MR. DISTRICT ATTORNEY— Is that correct?
"[DEFENSE COUNSEL]: That's correct, Your Honor.
"THE COURT: Mr. District Attorney, how do you feel?
"[DISTRICT ATTORNEY]: Well, let it go in, Judge.
"THE COURT: Okay. Thank you, Mr. Buckley.
"[DISTRICT ATTORNEY]: I assume Mr. Buckley would.
"THE COURT: Mr. Buckley, the note returned to the jury will be, 'Yes.'
"[DISTRICT ATTORNEY]: You know, you can't unring the bell. Let it go.
"[THE COURT]: Thank you gentlemen."

Some time later the jury requested the rereading of certain testimony. After discussion, it was agreed by defense counsel and the district attorney that the court reporter could go into the jury room and read the requested testimony—that of Dr. Rooney (autopsy) and the testimony of defendant from the point when he first heard the shot.[13]

We note that there is some confusion as to whether the defendant was present during the quoted proceedings. The minutes of the clerk's transcript expressly indicate that defendant was present at proceedings before and after the two incidents. For the specific time periods in question, the minutes do not reflect the defendant's presence. For the purposes of this appeal, therefore, we must assume that defendant was not present on either occasion.

### a) *Right to Presence.*

Defendant urges that the proceedings between the court and counsel, as well as the rereading of testimony in the jury room, were stages at which he was constitutionally or statutorily entitled to be present.

Article I, section 15, of the California Constitution states in pertinent part: "The defendant in a criminal case has the right . . . to have the assistance of counsel for the defendant's defense, to be personally present with counsel." The statutory implementation (§§ 977, 1043)[14] and decisional authorities on the right of presence are summarized in *People* v. *Jackson* (1980) 28 Cal.3d 264 [168 Cal.Rptr. 603, 618 P.2d 149], where

---

[13] The record of the court proceedings reads:

"(Whereupon at 3:25 p.m. the following proceeding are had in open court outside the presence of the jury.)

"THE COURT: On People v. Bloyd, I have a note from the jury saying they would have Dr. Rooney's testimony read back to them, and the Defendant Bloyd's testimony from when he first heard the shot to the very end of his testimony.

"Mr. Mathews is present, Mr. Buckley is present, and they both agree that the court reporter may go into the jury room and read the necessary testimony or requested testimony.

"You may read any testimony, Mr. Reporter, that they desire read. You cannot talk to them about the case. You will not talk to them about anything, save and except testimony to be read to them.

"THE REPORTER: Yes.

"THE COURT: Thank you.

"(Whereupon the court reporter, in the jury room with the twelve jurors present, by stipulation of counsel, reads the testimony requested.)"

[14] Section 977, subdivision(b) provides in pertinent part: "In all cases in which a felony is charged, the accused must be present at the arraignment, at the time of plea, during the preliminary hearing, during those portions of the trial when evidence is taken before the trier of fact, and at the time of the imposition of sentence. The accused shall be personally present at all other proceedings unless he shall, with leave of court, execute in open court, a written waiver. . . ."

Section 1043, subdivision (a) states: "Except as otherwise provided in this section, the defendant in a felony case shall be personally present at the trial."

the defendant was absent at a chambers hearing on motion for mistrial: "The cases which have interpreted the foregoing sections [§§ 977 and 1043] uniformly have held that the accused is not entitled to be personally present either in chambers or at bench discussions which occur outside of the jury's presence on questions of law or other matters in which defendant's presence does not bear a ' "reasonably substantial relation to the fullness of his opportunity to defend against the charge." ' [Citations.] ▮ Stated in another way, '[W]hen the presence of the defendant will be useful, or of benefit to him and his counsel, the lack of his presence becomes a denial of due process of law.' [Citations.] The burden is upon defendant to demonstrate that his absence prejudiced his case or denied him a fair and impartial trial." (*Jackson,* at pp. 309-310; see also *People* v. *Harris* (1981) 28 Cal.3d 935, 955 [171 Cal.Rptr. 679, 623 P.2d 240].)

▮ As to his absence in the rereading of the testimony, defendant asserts that he could have been particularly helpful in assuring that the rereading was accurate. As to his absence in the chambers proceedings in which it was decided to permit the jury to consider the Valium bottle as evidence, defendant claims that he was "in a particularly good position to offer insight as to the significance of the Valium bottle" because he had lived with Martha. In view of the defense testimony regarding Martha's ingestion of both alcohol and Valium and the inferences therefrom which it was suggested the jury make regarding Martha's state of mind and physical condition, it is inconceivable that the defense could do other than permit consideration of the bottle by the jury. The bottle could only help defendant, as the prosecutor must have ruefully recognized when he let it go in— "you can't unring the bell."

As to the proceedings wherein it was decided to accede to the jury's request for rereading of certain testimony, it is also inconceivable that the defendant would not have jumped at a chance to have *his* version of the events presented once more to the jury.

We conclude that defendant does not meet his burden to demonstrate that any of his absences prejudiced his case or denied him a fair trial. Given the nature of the matter discussed, defendant's presence was not necessary at the chambers proceedings in order to protect his interests. The court did not err in proceeding in his absence.

b) *Denial of Counsel.*

▮ We also reject defendant's claim that he was denied counsel when the trial court responded to the jury's requests. *People* v. *Hogan, supra,* 31 Cal.3d 815, upon which defendant relies, found serious error in sending

exhibits to the jury *without notifying counsel.* We stated the long-standing rule that communications from the jury should be entertained in open court, with notification of counsel. (*Id.,* at p. 848.) We also held that the trial court's action violated section 1138 which requires jury requests for information to be made in open court after notice to counsel.[15] We concluded that denial of counsel during jury deliberations may have affected rights of defendant: A jailhouse tape, among the exhibits sent to the jury room, contained inadmissible and highly prejudicial material; when the judge told counsel that he had given the tapes to the jury, counsel quickly informed the judge about the inadmissible portion of the tape.

*Hogan* is completely inapposite. In this case, counsel *was notified* and agreed in both instances with the court's handling of the jury requests. Defendant submits no authority for the proposition that counsel has no authority to enter into the stipulation—to accede to the jury's requests—without defendant's express consent.

## II. SPECIAL CIRCUMSTANCE ISSUE

 The only argument made as to the special circumstance is that it was not "charged" in accord with statute and due process. The information read: "It is further alleged that the murder of MARTHA . . . was committed by the defendant . . . , and, in addition to such murder, said defendant is now being charged with having murdered and has murdered . . . NORTH . . . within the meaning of Penal Code section 190.2(a)(3)." No special circumstance allegation apprised defendant of the murder of North with the additional murder of Martha.

Section 190.2, subdivision (a) states: "The penalty for a defendant found guilty of murder in the first degree shall be death or confinement in state prison for a term of life without the possibility of parole in any case in which one or more of the following special circumstances *has been charged and specially found* under Section 190.4, *to be true.* . . ." (Italics added.) Section 190.3 contains similar language.

While we may concede that there has been a technical error in charging, defendant could not have been misled. We see no due process implications under the circumstances of this case.

---

[15]Section 1138 provides: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

The prosecution charged and sought a first degree murder verdict as to both Martha and North. It could have charged a second special circumstance with the names in reverse position, but such duplicative use of the "multiple murder" special circumstance was proscribed in our later holding in *People* v. *Harris* (1984) 36 Cal.3d 36 [201 Cal.Rptr. 782, 679 P.2d 433], which cautioned that "alleging two special circumstances for a double murder improperly inflates the risk that the jury will arbitrarily impose the death penalty. . . ." (*Id.,* at p. 67.) Prosecutors obviously pleaded multiple murder special circumstances alternatively so as to avoid the precise argument which defendant is now making. It is suggested in *Harris* that appropriate charging papers should allege one "multiple murder" special circumstances separate from the individual murder counts. In the words of the statute (§ 190.2, subd. (a)), the information would read: "The defendant has in this proceeding been convicted of more than one offense of murder in the first or second degree."

There could have been no confusion of the jury in this case. After the jury reached its verdicts on the murder counts, the trial court sent it back to the jury room to make a finding on the special circumstance: "It's self-explanatory, but it must be found by the jury to exist." The jury found "the special circumstance alleged in the Information to be true, that is the defendant is guilty of multiple murders, one count of murder in the first degree and one count of murder in the second degree."

Other than the vague statement that "the defense might very reasonably have focused more upon Count I [murder of Martha]," defendant does not allege that the defense was in any way affected by the alleged charging error, and we find nothing in the record to indicate that it was.

### III. PETITION FOR WRIT OF HABEAS CORPUS

In a petition for habeas corpus consolidated with this appeal, defendant contends that he was denied effective assistance of counsel at both the guilt and the penalty phase of trial in violation of the federal and state Constitutions. (U.S. Const., 6th and 14th Amends.; Cal. Const., art. I, § 15.) Counsel was ineffective at the guilt phase of the trial, it is urged, (1) for failure to investigate the effect of Valium and/or alcohol on the behavior of Martha and (2) for failure to "fully examine and investigate new evidence found by the jury during its deliberations: i.e., a bottle of Valium pills found in Martha's robe." Defendant contends counsel was ineffective at the penalty phase for failure to present any mitigating evidence.

We concluded that a prima facie case was stated as to the penalty phase issue—failure to present mitigating evidence—and we issued an order to

show cause as to that issue. Inasmuch as the issuance of an order to show cause on a specific issue is an implicit determination that a prima facie case has not been made as to other issues presented in the petition for writ of habeas corpus, we address the other issues only briefly.

## A. *Adequacy of Counsel at Guilt Phase*

██ The adequacy of counsel claims at the guilt phase are directed primarily at counsel's investigation and handling of Martha's condition and state of mind at the time of her death. Specifically, as noted above, it is alleged that counsel did not consider the potential problems created by ingestion of both Valium and liquor and that he failed to call experts to testify to her condition and state of mind.

The same allegations in a different format—i.e., newly discovered evidence—were presented in an earlier petition for habeas corpus.[16] At that time it was alleged that the evidence, "newly discovered" *despite diligent pretrial investigation,* required reversal of the judgment. We concluded that defendant had not stated a prima facie case for relief at that time (Crim. 24394) and we reject the same contentions now presented in the format of denial of effective assistance of counsel.

The prosecution's case—that defendant first killed Martha and then her father—was supported by the physical and medical evidence. The defense sought to establish that Martha was the killer. It presented evidence of her violent propensities, which intensified when she was drunk. Additional evidence of the effect of Valium on Martha and her state of mind might have more precisely portrayed for the jury the drunken state of Martha on the evening in question, but failure to present additional evidence did not deprive defendant of a crucial defense nor markedly lighten the prosecution's burden. (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1]; *People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144].) It must be remembered that the bottle of pills was not found in the robe until the trial had been completed. The only question for counsel at that time was whether the jury could consider it as evidence and, inasmuch as it favored the defense, counsel

---

[16] The Valium pills and their effect on Martha were the subject of the earlier petition for habeas corpus in which defendant contended that the Valium found in Martha's bathrobe during jury deliberations was newly discovered evidence, as was proposed testimony by one Keith Killam, a pharmacologist, that Martha may have suffered a "paradoxical rage" in combining alcohol and Valium. We concluded that, inasmuch as Martha's use of Valium, her possession of pills prescribed by a physician, and an autopsy report of the quantity of Valium found in her body were matters of record, the new evidence, even if credited, could not undermine the People's entire case or establish defendant's innocence. (*In re Hall* (1981) 30 Cal.3d 408, 417 [179 Cal.Rptr. 223, 637 P.2d 690].)

properly agreed to let it be considered. Neither counsel's failure to pursue the matter of the pill bottle nor his failure to investigate the possible applicability of the "paradoxical rage" syndrome to Martha's behavior establishes a prima facie case of ineffective assistance of counsel.

### B. *Adequacy of Counsel at Penalty Phase*

Neither the prosecution nor the defense presented evidence at the penalty phase. Defendant now urges that defense counsel was inadequate for failure to present mitigating evidence. The affidavit of trial counsel in support of the petition for habeas corpus states that he did not proffer evidence at the penalty phase for defendant "because he expressly informed me that he didn't want this kind of evidence to be presented." Sympathetic factors that might have been presented, according to trial counsel, include the fact that both of defendant's parents were heavy drinkers; that because of their drinking, he lacked any parental backing or support; that defendant was very close to his father and was very upset when he died; and that defendant was foreclosed from an opportunity to attend college on a football scholarship because his parents were separated and could not afford the additional costs involved.

In *People* v. *Deere, supra,* 41 Cal.3d 353, we held that the failure of defense counsel to present any mitigating evidence in the penalty phase of a capital trial, in obedience to his client's request, required that the penalty be set aside. Based on our holding in *Deere* (see also *People* v. *Burgener* (1986) 41 Cal.3d 505 [224 Cal.Rptr. 112, 714 P.2d 1251]), we concluded that defendant had made a prima facie case for relief; we issued an order to show cause. In his return to the order, the Attorney General concedes penalty phase error in that trial counsel went along with defendant's request not to put on any evidence at the penalty phase.[17] The parties have waived oral argument on the conceded issue.

On the basis of the Attorney General's concession, we grant the petition for habeas corpus, discharge the order to show cause, and reverse the judgment of death. In all other respects the judgment (Crim. 22464) is affirmed. If the People do not elect to retry the issue of penalty, defendant remains sentenced to life in prison without possibility of parole.

---

[17] The Attorney General does not concede, however, that trial counsel provided "constitutionally" ineffective representation. Rather, he agrees with the position taken by Justice Broussard in *Deere* that counsel, if he failed at all, failed in his obligation to the state, not to his client.

Bird, C. J., Mosk, J., Broussard, J., Grodin, J., and Lucas, J., concurred.

Reynoso, J., concurred in the result.

Appellant's petition for a rehearing was denied February 11, 1987.