Filed 11/15/13  P. v. Rabbiosi CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CHRISTOPHER ANTONE RABBIOSI,<br><br>    Defendant and Appellant. | F064055<br><br>(Super. Ct. No. 1251118)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Ricardo Cordova, Judge.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Charles A. French and Caely E. Fallini, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Shawnee Butler died from a gunshot wound inflicted by a gun in defendant's control. Defendant argues the prosecution failed to prove the absence of heat of passion. He also contends the prosecutor prejudicially misstated the law on heat of passion. We agree the prosecutor misstated the law during closing argument, but hold that no prejudice resulted. We disagree with the remainder of defendant's contentions, and affirm.

## FACTS

### *Procedural Background*

A jury convicted Christopher Antone Rabbiosi (defendant) of murder (count I – Pen. Code, § 187, subd. (a)[1]) and two counts of assault with a deadly weapon (counts II & III – § 245, subd. (a)(1).) The jury found defendant did not act intentionally, deliberately and with premeditation. The jury found defendant did personally and intentionally discharge a firearm and proximately cause death to another person. (§ 12022.53, subd. (d).) Defendant was sentenced to an aggregate term of 42 years to life.

### *Prosecution's Case*

Shawnee Butler (Shawnee) left her husband Jerry Butler (Jerry) in 2008 for defendant. Shawnee and defendant traveled to Arizona, then Oklahoma together. Shawnee called Jerry from Oklahoma and asked for help to withdraw money from a joint account. Jerry testified that he complied and wired approximately $15,000 to Shawnee in Oklahoma.[2]

---

[1]    All subsequent statutory references are to the California Penal Code unless otherwise noted.

[2]    Documentary evidence suggested the actual amount was $9,916.72.

Shawnee was with defendant in Oklahoma for approximately one month. When Shawnee and defendant returned, Jerry let them live in his house which was being foreclosed.

A week or two before the shooting, Shawnee's sister Gina heard defendant speaking to Shawnee on a telephone call. Gina heard defendant say he would pay Shawnee back for money he owed her from the Oklahoma trip.

On the morning of September 18, 2008, Shawnee's stepson Jeremy left a message on defendant's phone intending to scare him. In the message, Jeremy said:

> "Hey, this is coming from a concerned party on Shawnee's side. I'm gonna tell you something, Bud. You better have that money in hand tonight. There's gonna be consequences. I'm not talking about the law. I'm not talking about anything like that. I'll take the fucking law in my own hands motherfucker. You don't know who I am; you don't need to know who I am. I know who you are. I know where you work. I know where you sleep. I know where you lay your head at night, Bud. I followed you. So don't fuck with me. Don't fuck with my family. Don't fuck with Shawnee. I will fuck you up. I will be your worst nightmare, Bud. Chris Rabbiosi, you motherfucker. You're gonna fuck with my family, if you're gonna fuck with us, I will fucken kill you. You motherfucken[]. You understand me? You better fucken have some money in her hands tonight. I swear to God on my life I will fucken rip your balls off, Dude. I will fuck you up Chris. Have some money tonight, Bro. If you don't, I swear to God there's gonna be consequences. You just better not even fucken go home tonight, Bud. You better fucken be on your way to fucken Oklahoma, fucken wherever you go. Go to San Francisco you gay motherfucker. Just get the fuck outta town if you don't have the money tonight. That's all I gotta say. Peace."

Gina had also left a voicemail for defendant that day. She said that if defendant did not have Shawnee's money, they would go to the police. The message concluded with, "The shit stops her [*sic*] and now. I have dealt with people like you before and I know how to get rid of ya. If I really have to send the police, believe me you will be dealt with. Good-bye."

At around 10:30 p.m. the same day (September 18), Shawnee called Jerry. Shawnee told Jerry she was going to meet defendant near his mother's house so that he

3.

could give her a check. Shawnee told Jerry that if he did not hear from her in 30 minutes, "something went wrong." Jerry told Shawnee to carry her cell phone and leave it on. Jerry thought something was "fishy" because the meeting was late at night.

After about 40 minutes, Jerry tried to call Shawnee. The call went "straight to her voice mail." Jerry left his shop and went looking for Shawnee and defendant. Jerry was accompanied by his son, Charlie, and an employee. Jerry drove by defendant's mother's residence and saw Shawnee in her "Tahoe."[3] Jerry testified that he "got a real good look at her, and she looked real scared, so [Jerry] knew again something wasn't right." Jerry made a U-turn and said he wanted to follow the vehicle "because something's going on." However, Jerry lost track of the vehicle and returned to his shop.

Jerry and Charlie again went back to look for Shawnee and defendant. Jerry drove his white, lifted pickup truck and Charlie rode as a passenger. They returned to the same area where they had seen Shawnee earlier. Charlie saw the parked Tahoe and said, "There they are." Jerry drove up to the Tahoe. When asked how fast he was driving as he approached the Tahoe, Jerry testified: "Slow. Twenty miles an hour, 15 miles an hour, slow." Jerry held his "bright lights" on "for a few seconds" to "get a good look to see what was going on in the car." He saw Shawnee, who "had the most terrified look on her face I've ever seen ever [*sic*] in 23 years." He also saw defendant "looking down, leaning down in the floorboard."

Before Jerry stopped his vehicle, he observed Shawnee hold up her hand. As soon as Jerry put his truck into park, he heard a gunshot. Charlie said, "Dad, that's a gunshot." Jerry jumped out of his truck. Defendant was outside of the Tahoe and yelled, "Get the hell out of here." Defendant was holding a gun up towards the sky. Jerry said, "Fuck you, motherfucker. You're pretty tough with that gun."

---

**3** Presumably a reference to the vehicle's model.

Jerry looked over and saw Shawnee with her head down. He ran for the Tahoe and was going to open the door. Before he could, defendant said, "Fuck you, motherfucker. You're a bitch." Defendant pointed his gun over the hood of the car and aimed it at Jerry. Jerry ducked, then started running. Defendant chased Jerry around the car. Then Charlie exited the pickup truck and said, "Chris [i.e., defendant], what the hell are you doing? We're just here to see -- check on my mom." Defendant started walking towards Charlie with the gun pointed at Charlie. Jerry told Charlie to run. Jerry himself opened the door to the Tahoe and saw blood everywhere. Shawnee had been shot and was dying.

Jerry said, "You motherfucker. You shot Shawnee." Defendant responded, "Fuck you." Jerry told Charlie to call 911. Charlie had gotten back into the pickup truck and Jerry thought Charlie was a "sitting duck." So, Jerry started saying obscenities to defendant. Defendant resumed chasing Jerry.

After hearing her dog barking, Sheila Purser exited her nearby home. Charlie told her to call 911 because defendant had shot his mother. Defendant "froze" and looked like a "[d]eer in … headlights." Then he ran away.

Shawnee died from the gunshot wound to the head. The bullet entrance wound was on her forehead.[4]

*Defense Case*

Defendant testified. He was asked, "What was Shawnee's attitude about the money at the time when you were in Oklahoma?" Defendant responded, "The time in Oklahoma, everything was ours. It wasn't hers and mine. We were starting a life together, so it was always conveyed to me that everything was just ours. The truck was ours. The money was ours. We were sharing everything." But, after Shawnee began

---

**4**    The coroner described the location of the entrance wound as "two-and-a-half inch[es] from [the] top of the head and two-inch[es] midline to the right."

having problems with her family regarding the money, defendant felt "an obligation to her because some of this money was spent on [him]."

On the morning of the shooting, defendant received the voicemails from Gina and Jeremy.[5] The messages made him "fearful" for his safety and his family's safety. He wanted to know who left the messages so he would know who to "watch out for" and to warn his parents. Defendant planned to contact police the next day regarding the messages.

Defendant spoke with Shawnee the day of the shooting. She wanted to meet with him. He reluctantly agreed so they could discuss the money and the threats. Defendant did not agree to give her the money that night.

Defendant brought a gun because he thought "something bad was going to happen." There were four bullets in the gun, though the gun could have carried "five or six" bullets in the magazine and one in the chamber. Shawnee picked him up in her Tahoe at about 11:30 p.m.

Shawnee initially parked the Tahoe, but eventually began driving around because she did not like being parked in that location. They drove around for "close to half an hour" and discussed their failed relationship, the phone messages and the money.

Defendant noticed Shawnee was acting nervous and "kind of fidgety a little bit." She had her left hand in the pocket of her large "hoody" sweatshirt. She was looking around at cars and defendant "got the feeling she was looking for somebody." Defendant got so uncomfortable that he asked Shawnee to take him home. Unexpectedly, Shawnee pulled over and parked the Tahoe.

Within a few minutes, a "big truck jacked up high [came] flying down [the street] right at [them], right at the driver's door." The truck flashed its high beams and pulled in front of the Tahoe, "kind of" blocking it in. Defendant "started kind of thinking" he had

<hr>

[5] At the time, defendant did not know who had left the message from Jeremy.

been "set up" and was "under attack." Defendant pulled his gun out of his pocket and "sort of" pointed it at the truck. He thought he saw someone come out of the truck. Shawnee made a "weird" movement to her pocket "like sh[e was] grabbing for something." Defendant thought she was "armed" and about to shoot him. "[I]t felt like … I was under attack, and she was participating in that attack, and I just kind of panicked, and the gun just went off."

Defendant immediately got out of the Tahoe. He did not realize the man outside was Jerry. Defendant thought the man was there to attack him. Defendant eventually saw Charlie. Defendant realized that Charlie and Jerry were not armed and there was no more threat, so he ran home.

Defendant's wife drove him to his grandfather's ranch in Patterson. Defendant testified that he was "suicidal" during the car ride. His wife urged him to turn himself in, not to commit suicide. Eventually, he did turn himself in the morning after the shooting.

Defendant apparently described the shooting to officers as "a point and shoot."[6] Defendant also told detectives that Shawnee "would never hurt anyone."

Defendant testified to phone calls he had from jail after the shooting. In one call, defendant said "I'll forever be sorry for this." A couple days before testifying at trial, defendant said to his mother that "we've all made our choices and we must live with them."[7]

On cross-examination, defendant testified that he was concerned while in the Tahoe, yet he stayed in the vehicle. He also testified that after having received the voicemails from Jeremy and Gina on the 18th, defendant went to his storage unit to

---

**6**   The prosecutor asked: "You told the officers it was a point and shoot; correct?" Defendant responded, "I guess I did."

**7**   This quotation is from the prosecutor's question asking whether defendant had said that phrase. Defendant responded, "Yes."

7.

retrieve items to sell, went to McDonald's, his father's house and the movie theater with his family.

*Jury Instructions on Count I*

As to Count I, the jury was instructed, inter alia, as to first and second degree murder, self-defense, voluntary manslaughter due to sudden quarrel or in the heat of passion, and voluntary manslaughter due to imperfect self-defense.

## DISCUSSION

On appeal, defendant claims the prosecution failed to prove the absence of heat of passion beyond a reasonable doubt. We disagree. We also disagree with defendant's assumption that the prosecution in this case was required to prove the absence of heat of passion.

I.      *HEAT OF PASSION.*

"The mens rea element required for murder is a state of mind constituting either express or implied malice. A person who kills without malice does not commit murder. Heat of passion is a mental state that precludes the formation of malice …." (*People v. Beltran* (2013) 56 Cal.4th 935, 942 (*Beltran*).)

"Heat of passion arises when 'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.'" (*People v. Barton* (1995) 12 Cal.4th 186, 201.) Thus, heat of passion has a subjective and an objective component. (*People v. Moye* (2009) 47 Cal.4th 537, 549 (*Moye*).) "'"To satisfy the objective or 'reasonable person' element … the accused's heat of passion must be due to 'sufficient provocation.'"'" (*Ibid.*) "To satisfy the subjective element … the accused must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation." (*Id.* at p. 550.)

8.

*II.*     *HEAT OF PASSION WAS NOT "PROPERLY PRESENTED."*

The Due Process Clause of the federal Constitution "requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation *when the issue is properly presented in a homicide case*." (*Mullaney v. Wilbur* (1975) 421 U.S. 684, 704, italics added (*Mullaney*); see also *People v. Rios* (2000) 23 Cal.4th 450, 461-462 (*Rios*); *People v. Najera* (2006) 138 Cal.App.4th 212, 223; *U.S. v. Roston* (9th Cir. 1993) 986 F.2d 1287, 1290.) "[U]nless it appears from the prosecution's case that the killing was committed in the heat of passion *and* upon sufficient provocation[,] the burden is on the defendant to raise a reasonable doubt in the minds of the jurors that malice was present."[8] (*People v. Sedeno* (1974) 10 Cal.3d 703, 719, italics added, overruled on other grounds by *People v. Breverman* (1998) 19 Cal.4th 142, 148-149 & *People v. Flannel* (1979) 25 Cal.3d 668, 684-685, fn. 12, superseded by statute on another point as stated in *In re Christian S.* (1994) 7 Cal.4th 768, 777; accord *Rios*, *supra*, 23 Cal.4th at pp. 461-462; see also § 189.5, subd. (a).)

As we explain, although there was some evidence adduced at trial regarding the objective component of heat of passion – sufficient provocation, there was no evidence of the subjective component: that defendant was actually under the influence of a strong passion when he shot Shawnee.

As previously stated, defendant testified that after Shawnee had picked him up, he noticed she was acting nervous and "kind of fidgety a little bit." She had her left hand in the pocket of her large "hoody" sweatshirt. She was looking around at cars and defendant "got the feeling she was looking for somebody." Defendant got so uncomfortable that he asked Shawnee to take him home. Unexpectedly, Shawnee pulled

---

[8]     *Mullaney* "does not forbid States from requiring the criminal defendant to present at least some evidence to raise a factual issue with respect to heat of passion …." (*Hankerson v. North Carolina* (1977) 432 U.S. 233, 237, fn. 3.)

9.

over and parked the Tahoe. Then, a pickup truck came "flying down" the street, flashed its high beams, and pulled up next to the Tahoe, "block[ing]" him in. Defendant thought he had been "set up." Defendant saw Shawnee grabbing for something and thought she was participating in the attack.

There was, therefore, evidence defendant thought his former mistress, the woman he still "loved," had tricked him and planned to hurt him. We need not, however, conclude whether this evidence was sufficient to "properly present" the objective component of heat of passion, for there was no evidence regarding the subjective component. "It is not enough that provocation alone be demonstrated. There must also be evidence from which it can be inferred that the defendant's reason was *in fact* obscured by passion at the time of the act. [Citations.]" (*People v. Sedeno, supra,* 10 Cal.3d at p. 719, italics added.)

In describing the shooting, defendant testified the "the gun just went off." Defendant further testified that after he told detectives his version of events, they did not believe him. "They said they thought I shot her because I was mad, and that I shot her on purpose because I was mad, because I thought … she set me up and I was mad and that's why I shot her. That was their whole thing." "*I told them that was not correct, that the shot was fired because I was in fear for my life.*" (Italics added.)[9]

Here, "nothing in the record, including defendant's own narrative of events leading up to the homicide, suggested he was actually, subjectively, under the influence of a 'strong passion' …." (*Moye, supra*, 47 Cal.4th at p. 552.) "[T]he evidence actually introduced on the point – the defendant's own testimony – was to the contrary." (*Id.* at p. 554.)

---

**9**    Defendant states on appeal that, at trial, his "main theory" was "perfect or imperfect" self-defense.

10.

"In short, the thrust of defendant's testimony below was self-defense .… There was [no substantial] evidence at the close of the evidentiary phase to establish that defendant 'actually, subjectively, kill[ed] under the heat of passion.' [Citations.] The only testimonial evidence on the point, substantial or otherwise, came from defendant himself .… His only claim was that he acted out of self-defense .…" (*Moye, supra,* 47 Cal.4th at p. 554.)[10]

Therefore, without deciding whether the evidence might arguably have supported an inference of ""sufficient provocation"" (*Moye*, *supra*, 47 Cal.4th at p. 549), the evidence did not suggest "the killing was committed in the heat of passion" (*People v. Sedeno*, *supra*, 10 Cal.3d at p. 719). The issue of heat of passion was not "properly presented" and the prosecution was not required to prove its absence.

III. *EVEN IF HEAT OF PASSION HAD BEEN "PROPERLY PRESENTED," THE JURY'S IMPLIED FINDING OF MALICE WAS SUPPORTED BY SUBSTANTIAL EVIDENCE.*

Even if the heat of passion issue had been properly presented, we conclude the evidence was sufficient to support the jury's implied malice finding. (See *People v. Bloyd* (1987) 43 Cal.3d 333, 350.)

Defendant claims the prosecution "failed to prove [the] absence of provocation" (*People v. Bloyd, supra,* 43 Cal.3d at p. 349). Such claims are without merit where (1) the trial court properly instructed on voluntary manslaughter and heat of passion or sudden quarrel, and (2) sufficient evidence supported the jury's finding of malice. (See *id.* at p. 350.) Here, defendant does not challenge the trial court's instructions on

---

**10** There are differences between *Moye* and the present case. *Moye* dealt with whether there was sufficient evidence to trigger the court's duty to instruct on heat of passion. (*Moye*, *supra*, 47 Cal.4th 540-541, 554.) Here, we are determining whether there was sufficient evidence to "properly present" heat of passion under *Mullaney* so as to require the prosecution to prove its absence. We cite *Moye* for a proposition we believe spans both contexts: evidence of self-defense is not necessarily evidence of heat of passion.

11.

voluntary manslaughter due to sudden quarrel or heat of passion. And, as we identify below, sufficient evidence supports the jury's implied finding of malice.

Defendant testified he brought the gun to meet with Shawnee because he thought "something bad was going to happen." Yet, there were only four bullets in the gun, when it could have carried "five or six" bullets in the magazine and one in the chamber.

Defendant testified that he "guess[ed]" he described the shooting to officers as "a point and shoot."

And perhaps the most persuasive evidence supporting the jury's implied finding of lack of heat of passion is defendant's testimony regarding his conversation with officers. As discussed above, defendant testified that police officers thought defendant killed Shawnee because he was mad that she had apparently set him up. Defendant testified he told them *that was not correct*.

In sum, "[e]ven if defendant's testimony provided some evidence of provocation for the jury to consider, it remains the jury's exclusive province to decide whether the particular facts and circumstances are sufficient to create a reasonable doubt as to whether the defendant acted under a heat of passion. [Citations.] Here, the jury was properly instructed on voluntary manslaughter and heat of passion or sudden quarrel. They found malice, and we conclude the evidence is sufficient to support the finding." (*People v. Bloyd, supra,* 43 Cal.3d at p. 350.)

IV.    *PROSECUTORIAL ERROR.*

Defendant claims the prosecutor prejudicially misstated the law during closing and rebuttal argument. We hold defendant forfeited this claim. Moreover, any error was harmless.

A.    *Defendant forfeited his claim of prosecutorial error.*

"When a defendant believes the prosecutor has made remarks constituting misconduct during argument, he or she is obliged to call them to the court's attention by a timely objection. Otherwise no claim is preserved for appeal. [Citation.] [¶] Defendant

12.

made no objection to the prosecutor's remarks and thus [forfeited] his claim.  His appeal is foreclosed on that basis.  Moreover, even if the claim had not been [forfeited], it would lack merit."  (*People v. Morales* (2001) 25 Cal.4th 34, 43-44.)

   B.  *The prosecutor misstated the law during closing argument.*

   In closing argument, the prosecutor stated:  "[I]n order to get to voluntary manslaughter, the defendant has to be provoked.  And here provocation, if the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment.  That's not Christopher's standard.  You need to look at a reasonable standard.  What would the average person do in that situation?"

   Later, she said:  "A defendant is not permitted to set up his or her own standard of conduct.  You don't look to see what he told you about it.  You look to the average person.  What would the average person do?  You must decide first was he provoked, and then would an average person have been provoked in that situation?  And how would that person react in that same situation knowing the facts?"

   The prosecutor's hypothetical question regarding provocation is arguably consistent with the law, assuming the prosecutor used the word "provoked" to have a certain, specialized meaning.  It would not have been erroneous to encourage the jury to determine whether defendant was "provoked" in the sense of being actually "'disturbed or obscured by some passion.'"  (*Beltran*, *supra*, 56 Cal.4th at p. 939.)  Nor would it have been incorrect to suggest the jury should determine whether an average person would have been "provoked" in the sense of being "induced to react from passion and not from judgment."  (*Ibid.*)

   But, the prosecutor's hypothetical question regarding what "the average person [would] do [in that situation]" adds another, incorrect prong to the analysis.  It asks how a reasonable person would have acted in defendant's position.  "[P]rovocation is not evaluated by whether the average person would *act* in a certain way:  to kill.  Instead, the question is whether the average person would *react* in a certain way:  with his reason and

13.

judgment obscured." (*Beltran*, *supra*, 56 Cal.4th at p. 949, original italics.) Here, the prosecutor's statements effectively "suggest[ed] that the jury should consider the ordinary person's conduct and whether such a person would kill.… [T]his was not the correct standard." (*Id.* at p. 954, fn. omitted.)

C. *The prosecutor did not misstate the law during rebuttal argument.*

Defendant also claims the prosecutor misstated the law during rebuttal argument.

During rebuttal argument, the prosecutor said: "You cannot look to what Christopher did or how Christopher acted. How would the reasonable person act? And that's not what the reasonable person would do. They would not reach around towards the back and shoot her practically between her eyes."

"The prosecutor's brief comment must be considered in context." (*People v. Collins* (2010) 49 Cal.4th 175, 233.) Here, the context is unclear as to whether the prosecutor was discussing a rubric for considering heat of passion or perfect self-defense.[11] The prosecutor's statements criticized by defendant are immediately preceded by the following:

> "The defense talked about voluntary manslaughter, imperfect self-defense, absolute self-defense. In order for you to find that the defendant, Christopher, acted in complete self-defense, you have to understand and believe that he used no more force than reasonably necessary. He shot her in the head point blank, and he didn't even shoot the threat. He shot someone else. [¶] Also, belief in future harm is not sufficient, and that's the reasonable person standard. [¶] In this self-defense issue we're talking about, what would a reasonable person do. If you were in a vehicle, you got a nasty phone call earlier that morning, you're here with someone you've been having an affair with, you have feelings for, you've embraced, you said she never tells a lie. [¶] Reasonable person. When you see a truck pull up, reasonable person would probably think oh, wow, there's going to be a traffic collision. Oh, wow, this car is flying in front of me. There's a drunk

---

**11** In the appellate briefs, defendant analyzes the comment as a heat of passion standard while the Attorney General discusses it as a self-defense standard.

driver in front of me. No. Reasonable standard, ladies and gentlemen. *You cannot look to what Christopher did or how Christopher acted….*" (Italics added.)

However, immediately *after* the challenged statement, the prosecutor stated:

> "If for some reason you find that there's not enough evidence or you believe there's some provocation to Christopher, I would urge you to agree on second degree murder, but please don't blame the victims. Please don't blame the Butler family, and please use your common sense and bring justice for Shawnee. And that would result in a murder conviction, whether it be first degree, which I think we've proven beyond a reasonable doubt, but if you believe there's some provocation like the jury instruction explained, use that provocation to go to second degree. There's no other option, ladies and gentlemen. Thank you."

If the prosecutor's statement challenged by defendant was intended to offer the jury a framework for analyzing heat of passion, it was incorrect. (See generally *Beltran, supra,* 56 Cal.4th 935.) The same reasoning applies from the analogous closing argument we analyzed earlier. (See § *IV.B., ante.*)

However, if the prosecutor's comment was made in the context of discussing perfect self-defense, it was a correct statement of law. In evaluating a claim of self-defense, the jury must "consider all the ""'facts and circumstances … in determining whether the defendant acted in a manner in which a reasonable man would act in protecting his own life or bodily safety.'"""" (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1083, italics omitted.) The ultimate question "is whether a reasonable person … would believe in the need to kill to prevent imminent harm." (*Id.* at p. 1087, italics omitted.) Therefore, the correctness of the prosecutor's statement of the law hinges on whether she was discussing perfect self-defense or heat of passion.

"'[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through [a] lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.'" (*People v. Tully* (2012) 54 Cal.4th 952, 1048, quoting *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 647.) Accordingly, and for the reasons explained below, we find it more plausible that the prosecutor was discussing self-defense, rather than heat of passion, when she

15.

made the comments defendant criticizes.  Therefore, the prosecutor's statement was not an incorrect statement of law, as explained above.

The subsequent sentence, which mentions provocation, was made near the end of the prosecutor's rebuttal argument.[12]  The sentence references not only provocation but also a potential conclusion by the jury that some portion of the prosecution's case lacked "enough" evidence.  Thus, it is more reasonable to interpret this sentence as the prosecutor's rhetorical pivot towards a broadly themed conclusion, rather than a continuation of a topic being discussed immediately prior.

Additionally, it is clear that immediately before the subject statement, the prosecutor is discussing perfect self-defense.  She quite plainly says, "*In this self-defense issue we're talking about*, what would a reasonable person do."  (Italics added.)  There is no intervening language that suggests she has changed topics to discuss heat of passion by the time she utters the comments condemned by defendant.

We conclude the prosecutor's comments can be reasonably construed as a correct statement of law.

D. *The prosecutor's error was harmless.*

Even if the prosecutor misstated the law on rebuttal, any error was harmless.  And while the prosecutor did misstate the law during closing argument, that error is also harmless.

First, as referenced in our discussion of the proper presentment of heat of passion under *Mullaney*, there was no evidence that defendant actually killed in the heat of passion.

Moreover, the court instructed the jury as follows:  "If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."  This instruction "told jurors to 'follow the law' as stated by the court.  We

---

[12]    It was the fifth-to-last sentence of the prosecutor's rebuttal argument.

assume the jury abided by the court's admonitions and instructions, and thereby avoided any prejudice." (*People v. Stitely* (2005) 35 Cal.4th 514, 559; accord *People v. Boyette* (2002) 29 Cal.4th 381, 436.)

## DISPOSITION

The judgment is affirmed.

_____
DETJEN, J.

WE CONCUR:


_____
KANE, Acting P.J.


_____
POOCHIGIAN, J.

17.