Filed 1/4/22  P. v. Picazo CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>EDGAR ADAM PICAZO,<br><br>    Defendant and Appellant. | F079345<br><br>(Super. Ct. No. VCF300758B)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  Gary L. Paden, Judge.

Jonathan E. Berger, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Michael A. Canzoneri and David A. Lowe, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Edgar Adam Picazo (defendant) was charged with murder committed under special circumstances within the meaning of Penal Code section 190.2.  (Undesignated statutory references are to the Penal Code.)  He pleaded no contest to first degree murder

(and other crimes) in exchange for an indicated prison sentence of 25 years to life and the dismissal of certain additional charges. Defendant subsequently filed two motions to withdraw his plea, and later a motion to dismiss the murder count in light of Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437). This appeal challenges the denial of those motions.

Senate Bill 1437 changed the law of murder by abrogating the natural and probable consequences doctrine and restricting the scope of the felony-murder rule. Defendant, however, was convicted pursuant to a theory of provocative act murder. Because this theory requires a defendant to personally harbor malice, appellate courts have consistently held it survives and is unaffected by the enactment of Senate Bill 1437. Defendant's remaining claims do not establish grounds for reversal. We therefore affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On May 27, 2014, at approximately 5:35 a.m., deputies from the Tulare County Sheriff's Department were dispatched to a private residence to investigate a reported crime in progress. They arrived to find Victor Hernandez DeHaro lying dead in a pool of blood in the driveway. One of the residents claimed to have shot DeHaro in self-defense and/or defense of others during a home invasion. In speaking with multiple occupants of the home, the deputies learned three additional perpetrators had fled the scene. It appeared the decedent's accomplices had dragged the decedent out of the house prior to their departure.

At approximately 5:50 a.m., surveillance cameras at an area hospital captured footage of two males carrying a third person toward the emergency department, dropping him off inside, and running back to their vehicle. The person who was dropped off, Rolando Magana (age 18), underwent surgery for gunshot injuries. Magana's companions were later identified as Francisco Padilla (age 21) and defendant (age 17).

2.

*Pretrial Proceedings*

The home invasion occurred two weeks prior to defendant's 18th birthday. Defendant later fled to Mexico and remained a fugitive until April 2016, when he surrendered to authorities at the international border. He reportedly turned himself in "because he was tired of being in Mexico."

In August 2016, a preliminary hearing was conducted regarding defendant's involvement in the events of May 27, 2014. The parties stipulated to certain facts, including the death of DeHaro from a gunshot wound to the chest. The testimony of prosecution witnesses provided the following additional information.

When deputies first arrived at the crime scene, the driveway was littered with "multiple spent shell casings" of two different calibers: .45- and .308-caliber. There were at least 10 bullet holes in the exterior stucco of the house, primarily located near two bedrooms. The front door had apparently been "kicked in or hit with a blunt object." "The bezel and frame to the door was broken off and located at least five feet inside of the residence."

There were "bloody drag marks" leading from the house to the dead body in the driveway. The decedent had gloves on his hands and a bandana covering the lower half of his face. A search of his person yielded identification cards, an iPhone containing photographic evidence of gang affiliation, and "a magazine which belonged to a Glock [pistol] containing live [.45-caliber] rounds."

Four residents had been present during the home invasion: an adult male (J.R.) and his three juvenile siblings. J.R. told investigators that he was awakened by a crashing noise, armed himself with a firearm, and exited his bedroom to investigate. He reportedly encountered "two armed male subjects." Upon seeing DeHaro pointing a gun at one of his siblings, J.R. fired at DeHaro and saw him "immediately [fall] to the floor."[1]

_____

[1]The quoted language describes J.R.'s version of the events. The sibling whom DeHaro had threatened reportedly told deputies that DeHaro exchanged gunfire with J.R.

After shooting DeHaro, J.R. saw Magana enter a bedroom. Believing another of his family members was in danger, J.R. chased after Magana and exchanged gunfire with him. Both men sustained bullet wounds. When his gun ran out of ammunition, J.R. struck Magana in the head with it and then retreated to his bedroom to obtain another firearm. Magana's injuries temporarily rendered him incapable of walking.

At least one of J.R.'s siblings reported seeing four intruders inside of the home at or near the time of the gunfire. When J.R. returned to his bedroom to re-arm himself, defendant and Padilla dragged and/or carried DeHaro and Magana out of the house.[2] J.R. subsequently looked out of his bedroom window and saw the perpetrators in his driveway. According to a deputy who interviewed J.R., "one of them had a rifle which he said that subject pointed toward him and fired a shot [¶] … [that] went through the glass of his window and struck him in the arm."

While processing the crime scene, deputies found a gun safe in J.R.'s room containing ammunition and an unspecified amount of "honey oil," i.e., concentrated cannabis. Further investigation revealed defendant had received Facebook messages from another apparent conspirator "a couple months prior" regarding a "lick" (robbery) that was to occur in the same town, and possibly on the same date, as where and when the home invasion was committed. The messages also referenced "'Toys'" (guns) and "'batteries'" (ammunition). Defendant exchanged similar messages with Magana,

---

[2]In his opening brief, defendant alleges he and Padilla did not enter the home until after the exchange of gunfire between J.R., DeHaro, and Magana. He cites to the probation report, but the probation report merely says, "J.R. returned to his bedroom to retrieve his AR-15, during which time two other suspects, later identified as Francisco Padilla and Edgar Picazo, grabbed [DeHaro] and Magana and drug them out of the residence." Other parts of the probation report indicate defendant was directly involved in the home invasion, e.g., "Magana, Padilla, Picazo and [DeHaro] broke into the victim's residence."

specifically indicating the target residence "contained a handgun and a rifle and they were planning on hitting it early while everyone was asleep."[3]

An expert witness testified regarding the allegedly gang-related nature of the incident and opined defendant was a Norteño gang member. Defendant was noted to have a facial tattoo indicative of allegiance to the gang, which had been documented prior to the home invasion. Defendant also had a "fairly large" tattoo across "the whole back of his head" of the word "Norte" and the number 14.

In September 2016, the surviving suspects (defendant, Magana, and Padilla) were jointly charged with murder based on the killing of DeHaro (§ 187, subd. (a); count 1), and with attempted premeditated murder of J.R. and his siblings (§§ 187, 664; counts 2–5). They were also charged with discharging a firearm into an inhabited dwelling (§ 246; count 6); attempted home invasion robbery (§§ 211, 213, subd. (a)(1)(A), 664; count 7); assault with a semiautomatic firearm (§ 245, subd. (b); count 8); and first degree burglary (§ 459; count 9).

Count 1 included special circumstance allegations of murder occurring during the commission or attempted commission of robbery and/or burglary. (§ 190.2, subd. (a)(17)(A), (G).) As to defendant, count 1 further included gang and firearm enhancement allegations. (§§ 186.22, subd. (b)(1)(c), (b)(5), 12022.53, subds. (d), (e)(1).) The attempted murder counts were alleged to be gang related such that each offense was punishable by a prison term of 15 years to life. (§ 186.22, subd. (b)(5).)

---

[3]In this part of the preliminary hearing testimony, some of the prosecutor's questions referred to the date of "April 27th." It is unclear whether these were inadvertent misstatements, since the home invasion occurred on May 27, 2014, or whether defendant and Magana had discussed a similar crime planned for exactly one month earlier. The prosecutor asked the law enforcement witness about "a message on April 27th around 2 A.M. from Rolando Magana asking [defendant] about a job they were—that was going to happen the next day." The witness testified there were messages from either "the 26th" or "the 27th" in which Magana had asked defendant, "What's up with that job tomorrow?" Defendant had replied, "That fool is paying up already." In his reply brief, defendant's appellate counsel assumes those messages were exchanged "the evening before the robbery," i.e., May 26, 2014.

Defendant pleaded not guilty to all charges. A trial setting hearing originally scheduled for October 3, 2016, was repeatedly continued. A transfer hearing was conducted in January 2018, which resulted in defendant being prosecuted as an adult. (See Welf. & Inst. Code, § 707.) After further delays, trial was finally set for August 22, 2018.

**Trial/Change of Plea Proceedings**

On the morning of trial, the judge asked the parties, "[I]s this a[] [life without the possibility of parole] case?" The prosecutor responded affirmatively, adding that for defendant, "[b]ecause he was two weeks under the age of 18 at the time, it's that discretionary life without parole. But the max on all of them is life without parole." The judge then asked if there had been "any settlement discussions about pleading to life with parole?" The prosecutor replied, "The only discussions that have been had or offers that have been made have been determinate terms that the People were not willing to accept at that point."

During an ensuing colloquy, the trial court stated, "Quite frankly, the way you should resolve it, I think they should all three plead to first [degree murder]. I don't know if anybody has talked about that or even considered it." The trial court opined the People appeared to have "a pretty rock-solid case" and then briefly summarized its understanding of the evidence. The judge concluded by saying, "So I mean, I don't know. Life is a lot better than life without the possibility of parole. [¶] But, you know, you three can take your chances, but placing your fate in the hands of twelve people from Tulare County to decide your fate. [¶] Anyhow."

A recess followed, which the trial court later estimated to be three hours long. When the proceedings resumed on the record, the judge said, "Gentlemen, I have been informed by your counsel that you wish to resolve this matter, and I can tell you I think that is a very smart move on your part because the evidence I believe is pretty overwhelming. [¶] … [¶] You're going to plead to several of these charges. I told your

6.

lawyer[s] I'm going to let the [prosecutor] put on the record what I think is right, what they think is right, and what the appropriate case should be. But bottom line is I intend to sentence you all to 25-years-to-life in prison."

The prosecutor advised that defendant's plea bargain included the resolution of a separately pending, but not yet filed, case involving defendant's attack on an inmate while awaiting trial. The "shanking" incident had occurred on August 30, 2017. Defense counsel stipulated to amending the operative information to add "count 10," which alleged attempted premeditated murder with gang, weapon, and great bodily injury enhancements.

The parties did not execute written plea agreements. The trial court verbally provided a standard advisement of rights and elicited the necessary acknowledgements and waivers. The prosecutor interjected to say, "Your Honor, I don't know if we explicitly covered, but I know it's usually applied. There needs to be an appellate waiver in this case." The purported waiver of appeal rights is further discussed in the body of this opinion.

Next, the trial court asked the prosecutor and defense counsel if they would "stipulate there is a factual basis for the pleas in this case based either on the police reports or the preliminary hearing transcript or both." The prosecutor said, "On both, your Honor," and defense counsel assented with replies of "yes." The defense attorneys also said "yes" when asked if they were afforded sufficient time to discuss the plea agreements with their clients; if they had advised their respective clients "of the nature of the charges, the consequences of his plea, any possible defenses he might have"; and if they believed their clients understood those issues.

Turning to the charges, the trial court said, "Count 1, alleges on or about May 27th, 2014, the crime of murder, a violation of Penal Code [s]ection 187. [¶] … [¶] [Defendant], what's your plea?" Defendant replied, "No contest." Shortly thereafter, the prosecutor said, "Your Honor, as to that, there needs to be a further admission that the

7.

aforesaid murder was committed willfully, deliberately, and with premeditation. I know it's not listed in there." The trial court immediately resumed its inquiries of the defendants:

> "THE COURT: All right. So do you admit that this murder was willful, deliberate, and premeditated? [¶] Mr. Magana[?] [Y]ou can say no contest if you want[.]
>
> "[MAGANA]: No contest.
>
> "THE COURT: [Defendant]?
>
> "[DEFENDANT]: No contest.
>
> "THE COURT: Mr. Padilla?
>
> "[PADILLA]: No contest."

Defendant further admitted, by a response of "no contest," the truth of the gang and firearm allegations pleaded in connection with count 1. He also pleaded no contest to counts 2, 3, 4, 5, and 10, as alleged in the information, and admitted all related enhancement allegations. Pursuant to the terms of the plea agreement, counts 6, 7, 8, and 9, as well as the special circumstance allegations for count 1, were to be dismissed at the time of sentencing.

The trial court found defendant's pleas were "freely and voluntarily made with an understanding of the nature of the charges [and] consequences of the plea." The trial court also found a factual basis for the pleas. The matter was then "referred to Probation with an indicated sentence of 25-years-to-life."

**First Motion to Withdraw Pleas**

On September 12, 2018, defendant filed a motion to withdraw his pleas. In a supporting declaration, defendant claimed he "did not have enough time" to consider the proposed plea bargain and "only chose to accept the offer on the day of trial because it was a package offer and [he] didn't want to mess it up for [his] co-defendants." The declaration continued: "I feel the time pressure as well as my desire to help my co-

8.

defendants overcame my free judgment and I was acting under duress at the time I made the decision to plead." The People opposed the motion.

On September 26, 2018, the motion was heard and denied. During the hearing, defendant claimed to have mistakenly believed the case was still going to trial despite his pleas of no contest: "I only entered such plea because I thought if I was going to trial, if I would have lost, that the initial time I would have receive [*sic*] is 25 years to life." Defendant also submitted "an enhanced declaration" containing the same allegation.

***Second Motion to Withdraw Pleas***

On November 5, 2018, defendant filed a "renewed" motion to withdraw his pleas. He now claimed to have previously been ignorant of section 3051, i.e., the statute that affords juvenile offenders eligibility for parole even if they are sentenced to life without the possibility of parole (LWOP). Pursuant to section 3051, subdivision (b)(4), a juvenile offender is entitled to a youth offender parole hearing during his or her 25th year of incarceration. Defendant alleged the prosecutor and the trial court (and by implication, his defense counsel) had misadvised him regarding his maximum exposure in the event of being convicted as charged. In a supporting declaration, defendant wrote, "The belief that I would get Life without the possibility of parole influenced my decision to plead before trial."

In a separate argument, defendant relied on "recently enacted [Senate Bill] 1437[,] which change[d] the definition of felony murder …." Although he conceded this case "involves a 'provocative act murder,'" defendant summarily argued Senate Bill 1437 "should apply in this case [because he] did not actually kill anyone." The People opposed the motion. On November 28, 2018, the motion was heard and denied.

During the hearing, the trial court impliedly made an adverse credibility determination vis-à-vis defendant's claim that his plea was influenced by a misunderstanding of the law:

9.

"Whatever comments I made [about LWOP], they are on the record. But it was after those comments that then all three defendants, along with all three lawyers, went into the jury room and you spent about three hours in there and I can only assume that all their rights were properly explained to the defendants in great detail, their legal positions, their rights and everything else. And I don't really feel it was my comments that created the plea. It was a three-hour meeting with six people that resulted in the plea. [¶] So because of that, I'm going to deny the motion. And I understand you would like to seek appellate review, and I think that's appropriate."

The trial court did not address the argument concerning Senate Bill 1437.

### Motion to Dismiss Count 1

On March 4, 2019, defendant filed a "Motion to Dismiss Count 1 Pursuant to SB 1437." (Some capitalization omitted.) The moving papers alleged the enactment of Senate Bill 1437 required the dismissal of count 1 because there was no longer a "factual basis to charge [defendant] with murder." Among other contentions, defendant argued "the provocative act doctrine is just a variation on the theme of felony murder and the natural and probable consequences theory of murder" and that Senate Bill 1437 "eliminated [the provocative act doctrine] as a separate theory of murder liability."

Defendant also argued his admission to the element of premeditation should be disregarded. While refraining from an outright claim of ineffective assistance of counsel, it was implied that neither defendant nor his attorney had understood the significance of the admission when it was made. In a reply brief to the People's opposition, defendant accused the prosecutor of "insert[ing] the word premeditated into the plea, after the factual basis had been stipulated to, in an attempt to circumvent SB 1437."

The People opposed the motion on various grounds. The primary argument was that Senate Bill 1437 is unconstitutional. Defendant's motion was also characterized as procedurally premature because he had not yet been sentenced. In another alternative position, it was argued defendant "failed to make a prima facie showing" for purposes of Senate Bill 1437 because "he was a major participant and acted willfully with a reckless disregard for human life."

10.

The motion was heard on May 14, 2019. Most of the parties' legal arguments were not addressed by the trial court. The ruling states:

"The two participants that went inside, one was killed. The other one was shot. Clearly, it was a home invasion robbery. The two who waited outside, they were armed. And when the one came out who was shot, the two outside sprayed the house with gunfire. [¶] It is clear from my understanding of the facts of the case, while the defendant may not have been the actual killer, he was a major player in the home invasion robbery and acted with a reckless indifference to human life by shooting at the house following the bungled or the botched 211 [robbery], with the understanding that there were several other people in the house, many of which could have been shot or injured. [¶] So for those reasons, the motion is denied."

Following the ruling, defendant was sentenced according to the terms of the plea agreement. The trial court imposed a prison sentence of 25 years to life for the conviction of first degree murder. Concurrent sentences of 15 years to life were imposed for the five convictions of attempted premeditated murder. Punishment for the enhancements was stayed.

On or about May 20, 2019, defendant filed a notice of appeal and requested a certificate of probable cause. The request was granted on the same date. The certificate request stated: "Defendant maintains that [his] plea was invalid as there was no factual basis for the plea to premeditated murder, and [the] District Attorney acted unethically when she inserted the premeditation into the plea colloquy. Defendant will appeal Court's Denial of Motion to Withdraw Plea as well as other motions filed post-plea."

**DISCUSSION**

**I.      Motion to Dismiss Count 1**

Defendant claims "the [trial] court's rationale for denying the motion [to dismiss count 1] lacked evidentiary support." Framing the issue in terms of sufficiency of the evidence, defendant focuses on whether the record shows he was a "major participant" in the home invasion and acted with "reckless indifference to human life." His arguments

11.

presume Senate Bill 1437 abrogated or otherwise altered the legal concept of provocative act murder.

As we will discuss in greater detail, "provocative act murder is not a unique or independent crime. It is simply a type of murder where causation, though sufficient, is somewhat more attenuated than that which occurs when the defendant is the actual killer[.]" (*People v. Mejia* (2012) 211 Cal.App.4th 586, 612; accord, *People v. Gonzalez* (2012) 54 Cal.4th 643, 649, fn. 2.) "A variation on the law of transferred intent, the provocative act doctrine holds the perpetrator of a violent crime vicariously liable for the killing of an accomplice by a third party, usually the intended victim or a police officer." (*Gonzalez*, at p. 654.) "The provocative act doctrine is to be distinguished from the felony-murder rule." (*Ibid.*)

The People argue Senate Bill 1437 made no changes to the provocative act doctrine. Therefore, according to the People, defendant's motion rested on an erroneous legal premise and it is unnecessary to consider whether the evidence showed defendant to be a major participant or demonstrated a culpable mental state. We agree. (See *People v. Zapien* (1993) 4 Cal.4th 929, 976 [""""a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion""""].)

## A. Legal Overview

Defendant concedes he was "convicted on a provocative-act murder theory." (Boldface omitted.) As a matter of law, this was the *only* theory upon which his conviction of first degree murder could have been based. The reasons why predate the enactment of Senate Bill 1437.

Since at least 1965, the California Supreme Court has held the felony-murder rule does not apply when an accomplice is killed by a crime victim rather than by the

12.

defendant or another of the defendant's confederates. (E.g., *People v. Washington* (1965) 62 Cal.2d 777, 781 ["When a killing is not committed by a robber or by his accomplice but by his victim, malice aforethought is not attributable to the robber, for the killing is not committed by him in the perpetration or attempt to perpetrate robbery"].) Put differently, "the felony-murder rule can be invoked only when the defendant or an accomplice actually commits the killing." (*People v. Concha* (2009) 47 Cal.4th 653, 661, fn. 2.) If the killing is not committed by the defendant or an accomplice, the felony-murder rule does not apply. (*People v. Gonzalez, supra*, 54 Cal.4th at p. 654.) Since it was undisputed the decedent, DeHaro, was killed by a victim of crimes perpetrated by defendant and his accomplices, count 1 could not have been based on a theory of felony murder.

Another theory of vicarious liability is the natural and probable consequences doctrine, under which "an accomplice is guilty not only of the offense he or she directly aided or abetted (i.e., the target offense), but also of any other offense committed by the direct perpetrator that was the 'natural and probable consequence' of the crime the accomplice aided and abetted." (*People v. Gentile* (2020) 10 Cal.5th 830, 843.) But the death of a perpetrator resulting from the actions of the crime victim is not an "offense" to which such liability can attach. Furthermore, in *People v. Chiu* (2014) 59 Cal.4th 155, the California Supreme Court held "that a defendant cannot be convicted of first degree premeditated murder under the natural and probable consequences doctrine." (*Id.* at p. 167.) In other words, when defendant was charged and pleaded no contest in this case (which postdated *Chiu* but predated Senate Bill 1437), the natural and probable consequences doctrine was not a viable theory of first degree murder liability. Therefore, defendant's count 1 conviction could not have been based on the natural and probable consequences doctrine.

"When someone other than the defendant or an accomplice kills during the commission or attempted commission of a crime, the defendant is not liable under felony-

murder principles but may nevertheless be prosecuted for murder under the *provocative act* doctrine." (*People v. Gonzalez*, *supra*, 54 Cal.4th at p. 654.) This theory of liability "requires proof that the defendant personally harbored the mental state of malice, and either the defendant or an accomplice intentionally committed a provocative act that proximately caused an unlawful killing." (*Id.* at p. 655.) "When the defendant or surviving accomplice acts in such a manner and the third party kills in response, the provocateur can be said to have proximately caused the resulting death notwithstanding the intervening use of deadly force by the third party."[4] (*People v. Mejia*, *supra*, 211 Cal.App.4th at p. 603.)

All forms of murder include actus reus and mens rea elements. (*People v. Concha*, *supra*, 47 Cal.4th at p. 660.) "To satisfy the actus reus element of murder, an act of either the defendant *or an accomplice* must be the proximate cause of death." (*Ibid.*) Under the provocative act doctrine, the actus reus is conduct sufficiently provocative of a lethal response by the crime victim or a third party to support a finding of malice. (*People v. Garcia* (1999) 69 Cal.App.4th 1324, 1329.)

"The classic provocative act scenario occurs when a perpetrator of the underlying crime instigates a gun battle, usually by firing first, and a police officer, or victim of the underlying crime, responds with privileged lethal force by returning fire …." (*People v. Mejia*, *supra*, 211 Cal.App.4th at pp. 602–603.) However, the provocative act doctrine "applies to *any conduct* that is '"fraught with grave and inherent danger to human life"'' so as to show a conscious disregard for human life." (*People v. Lima* (2004) 118 Cal.App.4th 259, 266.) A provocative act "is one that goes beyond what is necessary to

---

[4]"If the only provocative act is attributable to the deceased accomplice, his surviving accomplices may not be held liable for murder in connection with his death. This is because the deceased participant alone proximately caused his own death. Since one cannot be criminally liable for murder in connection with one's own death, one's surviving accomplices in the underlying crime cannot be vicariously liable for murder either." (*People v. Mejia*, *supra*, 211 Cal.App.4th at p. 603, fn. 4.)

14.

accomplish an underlying crime and is dangerous to human life because it is highly probable to provoke a deadly response." (*People v. Gonzalez*, *supra*, 54 Cal.4th at p. 655.) "When the chain of causation is somewhat attenuated, the jury decides whether murder liability attaches or not." (*People v. Briscoe* (2001) 92 Cal.App.4th 568, 586.)

"The provocative act doctrine may support either first or second degree murder. In order to return a first degree murder conviction, the jury must find that the defendant acted with express malice formed after deliberation and premeditation." (*People v. Gonzalez*, *supra*, 54 Cal.4th at p. 655, fn. 9; accord, *People v. Concha*, *supra*, 47 Cal.4th at p. 662.) "[W]here malice is merely implied from the defendant's conduct, the defendant is liable only for second degree murder." (*Concha*, at p. 663.) Here, defendant's admission that count 1 was "committed willfully, deliberately, and with premeditation" allowed him to be convicted of first degree murder.

### B. Analysis

Senate Bill 1437 was approved by the Governor in September 2018 and went into effect January 1, 2019. The legislation "amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) Prior to the enactment of Senate Bill 1437, "both the felony-murder rule and the natural and probable consequences doctrine provided theories under which a defendant could be found guilty of murder without proof of malice." (*People v. Lee* (2020) 49 Cal.App.5th 254, 260.)

As noted above, in defendant's motion to dismiss he argued Senate Bill 1437 also "eliminated" the provocative act doctrine. This argument "has been rejected by every court of appeal that has considered it." (*People v. Mancilla* (2021) 67 Cal.App.5th 854, 867; see, e.g., *People v. Swanson* (2020) 57 Cal.App.5th 604, 608; *People v. Johnson*

(2020) 57 Cal.App.5th 257, 261; *People v. Roldan* (2020) 56 Cal.App.5th 997, 1004–1005; *People v. Lee*, *supra*, 49 Cal.App.5th at pp. 263–267.) For the following reasons, we agree with the consensus view.

"A primary purpose of Senate Bill 1437 was to align a person's culpability for murder with his or her mens rea. [Citation.] To effectuate that purpose, Senate Bill 1437 amended section 188 to state that '[m]alice shall not be imputed to a person based solely on his or her participation in a crime.' (§ 188, subd. (a)(3).)" (*People v. Swanson*, *supra*, 57 Cal.App.5th at p. 611.) Because the provocative act doctrine did not previously allow the imputation of malice, it was not affected by this amendment. "Unlike felony murder or murder under the natural and probable consequences doctrine, '[a] murder conviction under the provocative act doctrine … requires proof that the defendant personally harbored the mental state of malice." (*People v. Lee*, *supra*, 49 Cal.App.5th at p. 264, quoting *People v. Gonzalez*, *supra*, 54 Cal.4th at p. 655.)

Senate Bill 1437 also amended section 189 for the purpose of limiting the scope of the felony-murder rule. (See *People v. Lewis* (2021) 11 Cal.5th 952, 957 [noting the legislation "limited the scope of the felony-murder rule"]; *People v. Sanchez* (2020) 48 Cal.App.5th 914, 917 ["Senate Bill 1437 narrowed the scope of liability for first and second degree murder by altering the doctrines that had allowed convictions for those offenses in the absence of malice"].) Previously, "'[f]elony-murder liability d[id] not require an intent to kill, or even implied malice, but merely an intent to commit the underlying felony.'" (*People v. Lee*, *supra*, 49 Cal.App.5th at p. 261, quoting *People v. Gonzalez*, *supra*, 54 Cal.4th at p. 654.) The provocative act doctrine, which had long been held distinguishable from the felony-murder rule, already required a showing of implied malice for a conviction of second degree murder and proof of express malice for a conviction of first degree murder. (*Gonzalez*, at pp. 654–655 & fn. 9.)

Defendant's claim fails for another reason as well. Even if we were to assume the amendment to section 189 added a "major participant" requirement to the provocative act

doctrine,[5] defendant has not demonstrated insufficiency of the evidence. As noted in respondent's brief, the parties stipulated to a factual basis for the plea based on the preliminary hearing transcript and the "police reports." The record on appeal contains the preliminary hearing transcript but none of the police reports. Defendant concedes this point but argues the *probation* report is an adequate substitute because it was partially derived from "[r]eports of the Tulare County Sheriff[']s Department."

Defendant's argument is unavailing. "It has long been settled that the burden is on an appellant to affirmatively show in the record that error was committed by the trial court." (*People v. Alvarez* (1996) 49 Cal.App.4th 679, 694.) The judgment is presumed correct, not the appellant's contrary assertions. "All intendments and presumptions are indulged to support [the judgment] on matters as to which the record is silent, and error must be affirmatively shown." (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564; see *Lynch v. Birdwell* (1955) 44 Cal.2d 839, 846 ["Error, it is elementary, will not be presumed in favor of reversing a judgment"].) Incidentally, as discussed in footnote 2, *ante*, the probation report says DeHaro, Magana, Padilla, *and Picazo* "broke into [J.R.'s] residence." Moreover, the probation report and preliminary hearing transcript are alone sufficient to support the trial court's conclusion that defendant was a major participant in the crime.

For purposes of Senate Bill 1437, "major participant" has the same meaning as in the context of section 190.2. (See § 189, subd. (e)(3); *In re Taylor* (2019) 34 Cal.App.5th 543, 561.) Factors to consider include "What role did the defendant have in planning the

---

[5]Senate Bill 1437 added section 189, subdivision (e): "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) [including robbery and burglary] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."

criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*People v. Banks* (2015) 61 Cal.4th 788, 803, fn. omitted.) "No one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Ibid*.)

The preliminary hearing evidence indicated defendant had prior knowledge and involvement in the planning of the home invasion. The messages he exchanged with Magana showed he was aware the residents of the targeted home possessed "a handgun and a rifle." He also knew of the plan to break into the house "early while everyone was asleep." Kicking or ramming open the front door of a residence at 5:30 a.m. with enough force to break the "bezel and frame," when one or more gun owners are sleeping inside, constitute "particular dangers" involving "a likelihood of resistance and the need to meet that resistance with lethal force." (See *People v. Banks*, *supra*, 61 Cal.4th at pp. 803, 811.)

At least one of the residents reported seeing four intruders inside of the home at or near the time of the gunfire, thus indicating defendant fully participated in the home invasion. Furthermore, a trier of fact could reasonably be convinced, beyond a reasonable doubt, that defendant discharged a firearm into the home prior to fleeing the scene. (See *People v. Banks*, *supra*, 61 Cal.4th at p. 803 ["What did the defendant do after lethal force was used?"].) Deputies found "multiple spent shell casings" of two different calibers in the driveway, indicating the use of both a rifle and a handgun. According to the probation report, defendant and Padilla "grabbed [DeHaro] and Magana and drug them out of the residence" before driving to the hospital. DeHaro was dead or dying, and Magana had sustained gunshot wounds "on the upper portion of each of his

18.

legs." Magana was incapacitated such that defendant and Padilla had to carry him to the getaway vehicle. Therefore, it is reasonable to infer defendant and Padilla were responsible for firing the bullets that penetrated the exterior of the home.[6] Accordingly, and for the other reasons discussed, the motion was properly denied.

## II.    Miscellaneous Claims

Defendant's opening brief devotes approximately 22 pages to arguing his pleas were influenced by a mistaken belief that he might never be eligible for parole if he lost at trial. In his reply brief, defendant unequivocally withdraws this argument. He concedes it is untenable due to contradictory statements made in his sworn declarations supporting the original and renewed motions to withdraw the pleas.

Given defendant's changed position, we limit our analysis to his secondary claims for reversal. One claim concerns the "factual basis for his admission that the murder was willful, deliberate, and premeditated." (Boldface and capitalization omitted.) The other claim is based on the contractual nature of plea agreements. He basically argues the plea agreement was not supported by adequate consideration.

### A.    Legal Overview

"A guilty plea is, for most purposes, the legal equivalent of a verdict of guilty reached by a jury." (*People v. Valladoli* (1996) 13 Cal.4th 590, 601.) "Indeed, it serves as a stipulation that the People need introduce no proof whatever to support the accusation: the plea ipso facto supplies both evidence and verdict." (*People v. Chadd*

---

[6]We reject defendant's arguments regarding the possibility of alternate scenarios, e.g., that Padilla or someone other than defendant discharged both the rifle and a second firearm "either at the same time or sequentially." "Our task in reviewing the sufficiency of the evidence … is not to weigh the evidence to determine the most likely interpretation. Rather, we view the evidence and the reasonable inferences therefrom in the light most favorable to the [fact finder's] determination, taking at face value evidence that is not inherently improbable, and presuming the existence of every fact reasonably deduced from that evidence. [Citations.] We ask not whether the [fact finder's conclusion] was the most probable interpretation of the evidence, but simply whether it was a rational one." (*People v. Navarro* (2021) 12 Cal.5th 285, 306-307.)

(1981) 28 Cal.3d 739, 748.) A plea of nolo contendere (no contest) has the same legal effect, i.e., it admits every element of the charged offense. (§ 1016, subd. 3; *People v. Wallace* (2004) 33 Cal.4th 738, 749.)

When accepting a conditional plea of no contest, a trial court must "cause an inquiry to be made of the defendant to satisfy itself that the plea is freely and voluntarily made, and that there is a factual basis for the plea." (§ 1192.5, subd. (c).) As held in *People v. Holmes* (2004) 32 Cal.4th 432, this can be accomplished "by directly questioning the defendant, or by garnering statements and admissions by his counsel." (*Id*. at p. 440.) "If the trial court inquires of defense counsel regarding the factual basis, counsel may stipulate to a particular document that provides an adequate factual basis, such as a complaint, police report, preliminary hearing transcript, probation report, grand jury transcript, or written plea agreement." (*Id*. at p. 442.) "When both parties stipulate on the record to a document, such as a police report, the factual basis requirement is met." (*Id*. at p. 440.)

"'The trial court need not obtain an element-by-element factual basis but need only obtain a prima facie factual basis for the plea.'" (*People v. Richardson* (2021) 65 Cal.App.5th 360, 372.) In *Holmes*, for example, the trial court satisfied its obligation under section 1192.5 by asking the defendant "whether he did what was charged in the complaint." (*People v. Holmes*, *supra*, 32 Cal.4th at p. 436.) The case holds "a trial court possesses wide discretion in determining whether a sufficient factual basis exists for a guilty [or no contest] plea." (*Id*. at p. 443.) Its acceptance of the plea, "after pursuing an inquiry to satisfy itself that there is a factual basis for the plea, will be reversed only for abuse of discretion." (*Ibid*.)

"Under section 1237.5, a defendant may appeal from a conviction on a plea of guilty or no contest only on grounds going to the legality of the proceedings; such a plea precludes appellate consideration of issues related to guilt or innocence, *including the sufficiency of the evidence to support the conviction*." (*People v. Palmer* (2013) 58

20.

Cal.4th 110, 114, italics added.)  In *Palmer*, the California Supreme Court noted but declined to resolve a split of authority regarding whether an appellant's "challenge to the trial court's finding of a factual basis for his no contest plea is one going to the legality of the proceedings and hence cognizable on appeal," or whether such claims amount to prohibited sufficiency-of-the-evidence arguments.  (*Id*. at pp. 114, 115.)  The high court resolved *Palmer* on the merits because, as framed, the appellant's claim challenged "the superior court's procedure in soliciting facts, not its discretionary evaluation of the facts." (*Id*. at p. 115.)

### B.    The "Factual Basis" Claim

Defendant's opening brief challenges the factual basis for his plea as to count 1 because of allegedly insufficient evidence of the required mens rea.  In making those arguments, defendant also contends neither he nor his defense attorney understood the legal significance of his admission to the willful, deliberate, and premeditated nature of the offense.  In his reply brief, defendant recharacterizes the claim as one challenging "the legality of a component of [his] plea on the basis that the court's inquiry into the factual basis for it was insufficient—indeed, nonexistent."  However, his reasoning is still based on allegations of insufficient evidence.  He argues the trial court could not have made an adequate inquiry into the factual basis for his plea because the record did not contain sufficient evidence of premeditation and the intent to kill.

The record shows the trial court fulfilled its duty under section 1192.5.  It made an inquiry regarding the factual basis for the plea and then obtained stipulations from defense counsel and the prosecutor based on the preliminary hearing transcript and "police reports."  (See *People v. Holmes*, *supra*, 32 Cal.4th at p. 440–441.)  For the element of premeditation, the trial court questioned defendant and obtained an admission. (*Id*. at p. 440.)  There was no reaction by defendant's attorney to suggest the admission was unexpected or perceived as ill-advised.

21.

"[I]n making the factual basis determination, a trial court may "'satisfy itself by statements and admissions made by the defendant, his counsel, and the prosecutor ….""" (*People v. Palmer*, *supra*, 58 Cal.4th at p. 117, quoting *People v. McGuire* (1991) 1 Cal.App.4th 281, 283.)  "It is not necessary for the trial court to interrogate the defendant about possible defenses to the charged crime [citation], nor does the trial court have to be convinced of defendant's guilt."  (*People v. Holmes*, *supra*, 32 Cal.4th at p. 441.)  Furthermore, as discussed in *Palmer*, "defense counsel may advise acceptance of a plea agreement based in part on [confidential] admissions the client has made or on other defense investigation, and may rely on such admissions or investigation in stipulating to the factual basis for a plea.  We will not read into section 1192.5 a requirement that counsel explicitly refer to those privileged sources as the basis for the stipulation."  (*Palmer*, at p. 119.)

Defendant notes his attorney's stipulation to the factual basis was made before the prosecutor's on-the-record statements about premeditation and prior to defendant's admission to that element.  Based on the sequence of events, he implores us to assume (1) premeditation was not discussed during the plea negotiations and (2) the requested admission came as a surprise to both him and his attorney.  Defendant overlooks that both the trial court and defense counsel are presumed to have been familiar with the applicable law.  (See *People v. Barrett* (2012) 54 Cal.4th 1081, 1105; *People v. Stowell* (2003) 31 Cal.4th 1107, 1114.)

The plea negotiations followed the trial court's suggestion that defendant, Magana, and Padilla all "plead to first."  When proceedings resumed on the record three hours later, the trial court said, "Gentlemen, I have been informed by your counsel that you wish to resolve this matter ….  [¶] … [¶] You're going to plead to several of these charges.  … But bottom line is I intend to sentence you all to 25-years-to-life in prison."  The trial court's initial suggestion and its indicated sentence of 25 years to life strongly

22.

imply the agreement was for defendant to plead guilty or no contest to first degree murder.[7]

"A person who kills unlawfully and intentionally is guilty of first degree murder if the intent to kill is formed after premeditation and deliberation. [Citations.] If the person kills unlawfully and intentionally but the intent to kill is not formed after premeditation and deliberation, the murder is of the second degree." (*People v. Gonzalez*, *supra*, 54 Cal.4th at p. 653.) As we have explained, the only viable theory under which defendant could have been convicted of first degree murder was the provocative act doctrine, and that theory requires "express malice formed after deliberation and premeditation." (*Id.* at p. 655, fn. 9; accord, *People v. Concha*, *supra*, 47 Cal.4th at p. 662.) Defendant concedes the prosecutor's request for an admission of premeditation "was almost certainly because it was a prerequisite to a first-degree murder conviction under the 'provocative act' doctrine."

Further undermining defendant's argument is the fact none of his post-plea motions included a declaration attesting to surprise or mistake regarding the admission of premeditation—either on his part or by defense counsel. There is a significant difference between hinting at ineffective assistance in motion papers and admitting to professional negligence in a sworn declaration. (See *People v. Manibusan* (2013) 58 Cal.4th 40, 55 [unsworn statements of counsel in defendant's motion held "insufficient" to support the motion]; *In re Zeth S.* (2003) 31 Cal.4th 396, 414, fn. 11 ["It is axiomatic that the unsworn statements of counsel are not evidence"].) If defendant is impliedly alleging ineffective assistance of counsel, the issue "is more appropriately decided in a habeas corpus proceeding." (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267.) "'If the

---

[7]"Every person guilty of murder in the first degree shall be punished by death, [LWOP], or imprisonment in the state prison for a term of 25 years to life." (§ 190, subd. (a).) Except under circumstances not applicable in this case, "every person guilty of murder in the second degree shall be punished by imprisonment in the state prison for a term of 15 years to life." (*Ibid*.)

record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal.'" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003.)

To prevail on his claim, defendant would essentially need to show factual or legal impossibility—which he cannot do. (See *People v. Richardson*, *supra*, 65 Cal.App.5th at p. 373 [holding acceptance of a plea based on factually impossible stipulations is an abuse of discretion]; *People v. Voit* (2011) 200 Cal.App.4th 1353, 1365 ["A defendant may … assert that his admission included a legal impossibility"].) In *Richardson*, a trial court erred by accepting a plea of no contest to human trafficking of a minor (§ 236.1, subd. (c)(1)) "when it became abundantly clear *on the record* that the victim was '27' years old." (*Richardson*, at p. 373.) Another example of impossibility would be "a no contest plea to murder where the victim is still alive." (*Id*. at p. 364.)

Defendant ignores the fact he also pleaded no contest to four related counts of attempted premeditated murder as alleged in the charging information. It is possible he and his fellow gang members planned all along to rob *and* kill J.R. The trial court may have considered this in conjunction with the evidence indicating defendant and Padilla fired multiple rounds from the driveway after DeHaro was mortally wounded. (See *People v. Nguyen* (2015) 61 Cal.4th 1015, 1054–1055 [a defendant's postoffense conduct may provide circumstantial evidence of a prior intent to kill]; see generally *People v. Canizales* (2019) 7 Cal.5th 591, 602 ["Direct evidence of intent to kill is rare, and ordinarily the intent to kill must be inferred from the statements and actions of the defendant and the circumstances surrounding the crime"]; *People v. Bloyd* (1987) 43 Cal.3d 333, 348 ["premeditation and deliberation can occur in a very short period of time"].)

## C.    Contract Claim

"A negotiated plea agreement is a form of contract, and it is interpreted according to general contract principles."  (*People v. Shelton* (2006) 37 Cal.4th 759, 767.) Consideration is an essential element of a contract.  (Civ. Code, § 1550.)  Consideration is defined as "[a]ny benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor."  (*Id.*, § 1605.)

Defendant argues the plea bargain was invalid for lack of adequate consideration. In his words, the "government's performance" under the contract merely consisted of "agreeing to grant [defendant] a parole hearing in his 25th year of incarceration, which the law required the government to do anyway."  The People argue this issue was waived and alternatively dispute the claim on the merits.

### *Waiver*

The People's waiver argument is based on the following exchange at the change of plea hearing:

> "[PROSECUTOR]:  Your Honor, I don't know if we explicitly covered, but I know it's usually applied.  There needs to be an appellate waiver in this case.
>
> "THE COURT:  What that means, gentlemen, is when we come back for sentencing and that can be any time, —if you want some extra time I can do that—but when I do sentence you, that means the case is all over. There's no right to appeal.  It's over and done.  [¶] Do you understand that, Mr. Magana?
>
> "[MAGANA]:  Yes, sir.
>
> "THE COURT:  [Defendant]?
>
> "[DEFENDANT]:  Yes, sir."

In the interest of judicial economy, we decline to analyze whether or to what extent defendant may have waived his appeal rights by responding affirmatively to the court's question. Although defendant's second motion to withdraw the plea was not based on contract principles, the basic gist of the argument regarding his sentencing exposure was clearly asserted. In denying the motion, the trial court said, "I understand you would like to seek appellate review, and I think that's appropriate."

Pursuant to section 3051, an offender who receives a life sentence for a crime committed "before the person had attained 18 years of age … shall be eligible for release on parole at a youth offender parole hearing during the person's 25th year of incarceration." (*Id.*, subd. (b)(4).) "As originally enacted, section 3051 applied only to non-LWOP offenses committed before the offender was 18 years old. [Citation] [But a]n amendment effective January 1, 2018 … included LWOP offenses committed before age 18." (*In re Jenson* (2018) 24 Cal.App.5th 266, 277.)

The amendment to section 3051 conferring eligibility for parole notwithstanding an LWOP sentence was in effect when defendant entered into his plea agreement. (Stats. 2017, ch. 684, § 1.5.) He thus contends that avoiding a possible sentence of LWOP under section 190.5 "was of no value" to him. (Boldface omitted.) He makes the same argument as to the dismissal of counts 6 through 9 and resolution of the unrelated attempted murder charge, i.e., count 10. He reasons there was no benefit to avoiding aggregated punishment beyond a sentence of 25 years to life because such punishment would have no impact on his eligibility for early parole.

Section 3051 did not render defendant's plea agreement legally invalid for lack of consideration. "'Any suspension or forbearance of a legal right constitutes a sufficient consideration.'" (*Adolph Ramish, Inc. v. Woodruff* (1934) 2 Cal.2d 190, 207.) "As stated by Professor Corbin, '… if the bargained-for performance rendered by the promisee includes something that is not within the requirements of his preexisting duty, the law of consideration is satisfied.… It is enough that some small additional performance is

bargained for and given.'" (*Raedeke v. Gibraltar Sav. & Loan Assn*. (1974) 10 Cal.3d 665, 674, fn. 3.)  A prosecutor's agreement to dismiss felony charges that likely would have resulted in felony convictions "is sufficient consideration to enforce the plea bargain."  (*People v. Rushing* (2008) 168 Cal.App.4th 354, 362.)

Furthermore, there are collateral consequences of being sentenced to LWOP that are not mooted by the eligibility for parole under section 3051.  For example, the LWOP designation affects an inmate's housing options within the prison system.  (See Cal. Code Regs., tit. 15, § 3375.2.)  "[W]hen extending mandatory youth offender parole hearings to individuals sentenced to life without parole, the Legislature … did not amend section 190.5, subdivision (b)'s sentencing alternatives.  By thus preserving a distinction between life without parole and a term of 25 years to life for offenders subject to section 190.5, subdivision (b), the Legislature signaled its understanding a material difference between those two sentences remains, notwithstanding the availability of a youth offender parole hearing during the 25th year of incarceration under either alternative."  (*People v. Ochoa* (2020) 53 Cal.App.5th 841, 851.)  Whether those differences motivated defendant or whether he received bad advice in relation to his acceptance of the plea offer are issues beyond the scope of this appeal.

## DISPOSITION

The judgment is affirmed.


                                                                    PEÑA, J.
WE CONCUR:


FRANSON, Acting P. J.


SMITH, J.

27.